UNITED STATES of America, Plaintiff,

v.

Neal WRIGHT and Dost Mahadik, Defendants.

Crim. A. No. 91–385.

United States District Court, D. New Jersey.

Feb. 18, 1994.

Charles B. McKenna, Asst. U.S. Atty., Newark, NJ, for U.S.

Michael V. Gilberti, Budd Larner Rosenbaum Greenberg & Sade, P.C., Short Hills, NJ, for defendants.

## OPINION

LECHNER, District Judge.

After a jury trial, defendant Neal Wright ("Wright") was convicted on both counts of a two count indictment. Currently before the court is Wright's motion for judgment of acquittal pursuant to Fed.R.Crim.P. 29(c) or, in the alternative, for a new trial pursuant to Fed.R.Crim.P. 33. Also before the court is Wright's motion for resentencing pursuant to Fed.R.Crim.P. 35(c).[1] For the reasons set

---

1. In support of his motions, Wright submitted: Letter-brief, dated 8 May 1992 but submitted 20 May 1992, in support of Wright's motion for resentencing (the "Wright Resentencing Brief"); Brief in Support of Motion for Judgment of Acquittal Notwithstanding Verdict, or in the Alternative for a New Trial, dated 9 August 1993, (the Judgment of Acquittal Notwithstanding Verdict, or in the Alternative for a New Trial, dated 9 August 1993, (the Wright Brief); Traverse to Government's Letter in Opposition to Motion of Acquittal Notwithstanding the Verdict or in the Alternative a New Trial, undated, filed 8 September 1993 but never submitted (the "Wright Traverse"); Response to Government[']s Supplemental Opposition Brief to Defendant[']s Motion for Judgment of Acquittal Notwithstanding the Verdict, or in the Alternative a New Trial (the "Wright Response"); Letter–Brief, dated 7 January 1994 (the 7 January 1994 "Wright Brief").

In opposition to Wright's motions, the United States (the "Government") has submitted: Letter–Brief, dated 26 August 1993 (the "Government Letter–Brief"); Memorandum of Law, dated 26 November 1993 (the "Government Brief").

A hearing on Wright's post-trial motions was held 10 February 1994 (the "Post–Trial Motion Hearing"). Citations to the transcript of the Post–Trial Motion Hearing will be as: "10 Feb. Tr. at ___."

The procedural history of the decision on Wright's motions is detailed *infra* at 4 & n. 6.

forth below, Wright's post-trial motions are denied.

*Facts*

On 14 August 1991, the Grand Jury returned a two-count indictment (the "Indictment") charging Wright and co-defendant Dost M. Mahadik ("Mahadik") with violations of the Comprehensive Drug Abuse Prevention and Control Act, 21 U.S.C. §§ 801, *et seq.* Count one of the Indictment ("Count I") charged Wright and Mahadik with conspiring "with each other, and with others," to possess heroin with intent to distribute same, in violation of 21 U.S.C. § 846. Count two of the Indictment ("Count II") charged Wright and Mahadik with possession of heroin with intent to distribute same, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

When first arraigned, Wright and Mahadik each entered pleas of not guilty with respect to both counts in the Indictment. On 24 October 1991, Wright retracted his plea of not guilty with respect to Count I and pled guilty to that count. Also on 24 October 1991, Mahadik entered into a plea agreement with the Government whereby he pled guilty to a superseding information filed that day (the "Superseding Information").[2] On 22 January 1992, Mahadik was sentenced on the Superseding Information.

On 19 March 1992, the day he was scheduled to be sentenced, Wright withdrew his plea of guilty to Count I of the Indictment and again entered a plea of not guilty with respect to that count. Trial before a jury commenced 28 April 1992.[3] After trial and deliberation, the jury found Wright guilty on both counts of the Indictment.

On 8 May 1992, after a sentencing hearing (the "Sentencing Hearing"), Wright was sentenced to 120 months on each count of the Indictment, to run concurrently, and eight years supervised release on each count, also to run concurrently.[4] Before sentencing, Wright moved orally for judgment of acquittal or, in the alternative, for a new trial. Wright's oral application was denied because Wright's arguments were insufficiently specific, but written submissions on the issues raised were invited. Sentencing Tr. at 28, 31.

On 8 May 1992, Wright filed a notice of motion for a new trial, and a notice of appeal of his conviction. On 20 May 1992, Wright filed a notice of motion for resentencing and a notice of motion for judgment of acquittal.[5] No submissions on Wright's post-trial motions were received until 18 August 1993, and the submissions were completed 14 January 1994.[6]

On 18 January 1994, the Circuit filed a *Judgment Order* affirming Wright's conviction and sentence over his contentions "that the [district] court erred:"

1. By sentencing him to an enhanced penalty (a ten-year mandatory minimum sentence) on the basis of a prior conviction when the enhanced penalty information

---

2. The Superseding Information charged that Mahadik, "having knowledge of the actual commission of a felony . . ., the possession with intent to distribute a controlled substance, in violation of [21 U.S.C. § 841], did knowingly and wilfully conceal and fail to make known the same as soon as possible to a judge or other person in civil or military authority. . . .[,] in violation of [18 U.S.C. § 4]." Superseding Information at 1.

3. Citations to the transcript of the trial will be as: "Tr. at ___."

4. Citations to the transcript of the Sentencing Hearing will be as: "Sentencing Tr. at ___."

5. The Government argues Wright's motions were untimely. *See* Government Brief at 5. However, because Wright's motions fail on substantive grounds, it is not necessary to address the Government's contention in this regard.

6. In the Government Letter–Brief, the Government argued only that the court lacked jurisdiction over Wright's motions during the pendency of his appeal, and did not address the merits of Wright's motions. The Government's contention in this regard appeared erroneous. *See United States v. Cronic,* 466 U.S. 648, 667 n. 42, 104 S.Ct. 2039, 2051, n. 42, 80 L.Ed.2d 657 (1984); *Venen v. Sweet,* 758 F.2d 117, 123 n. 7 (3d Cir.1985). The Government was notified to this effect at a status conference held 28 October 1993. By letter, dated 12 November 1993, the Government requested leave to submit additional briefs on the merits of Wright's motions. Pursuant to a briefing schedule thereafter established by the court, the final submissions in this matter were received from Wright on 14 January 1994.

had been filed on the day jury selection commenced;

2. By failing to advise him that he had a right to challenge the prior conviction considered in imposing the enhanced penalty; and

3. By instructing the jury as it did on the conspiracy charge (believing that the defendant could be convicted of conspiracy if he "encouraged, advised, assisted or advanced a plan" and refusing to give a *Sears* instruction), allegedly permitting both a conspiracy conviction and substantive convictions on insufficient evidence.

*United States v. Wright,* No. 92–5620, slip order at 1–2 (3d Cir. 18 Jan. 1994).

### Evidence Offered at Trial

Wright requests judgment of acquittal based on his contention that the evidence adduced at trial was insufficient, as a matter of law, to convict him. In order to address this contention, it is necessary to evaluate the evidence offered by the Government against Wright at trial.[7]

The Government commenced its case with the testimony of Edward Corrigan ("Agent Corrigan"), an agent of the Federal Bureau of Investigation ("FBI") who participated in the investigation and arrest of Wright. Agent Corrigan testified that on 8 August 1991, he and other Government agents were conducting surveillance of room 419 ("Room 419") at the Comfort Inn Victorian in Pleasantville, New Jersey, near Atlantic City (the "Comfort Inn"), where a drug transaction was expected to occur. Tr. at 44–45.

Agent Corrigan testified that during surveillance, Thomas Monroe, also an agent of the FBI ("Agent Monroe"), who had been in Room 419, exited Room 419 and indicated to Agent Corrigan that heroin was present in the room. *Id.* at 45. Shortly thereafter, Agent Corrigan testified, Wright exited Room 419 and fled down the hallway, where he was arrested. *Id.* Agent Corrigan testified that upon being arrested, Wright was escorted back to Room 419 and was advised of his right to remain silent and his right to have an attorney present during questioning. *Id.* at 36.

Wright was then taken to Agent Corrigan's office in Lynwood, New Jersey (the "8 August Interview"). Agent Corrigan testified that upon having his handcuffs removed, Wright "stated that he wanted to cooperate and make a statement concerning the investigation." *Id.* at 37. According to Agent Corrigan, Wright "said he wanted to mitigate the charges pending against him. [He said] [h]e wanted favorable consideration for his charges." *Id.* Agent Corrigan stated that Wright was told the FBI "couldn't make any guarantees," but nevertheless continued to make a statement.[8] *Id.* at 37–38.

According to Agent Corrigan, Wright "stated that he had, in fact, delivered approximately six ounces of heroin earlier that day to the Comfort Inn [ (the "8 August Sale") ]." *Id.* at 38. Wright further stated "that he delivered it to a person that he had met through George Rex [ ("Rex") )." *Id.* Rex was a confidential informant for the FBI, and the person to whom Wright delivered the

---

**7.** Notwithstanding the central importance of the quantum and quality of testimonial and documentary evidence to an inquiry regarding sufficiency of evidence, the Government's submissions contain but a single citation to the trial transcript. The balance of the Government's discussion of the sufficiency of the evidence consists of conclusory characterizations of the evidence adduced at trial, with no indication even as to the witness or document through which the evidence was introduced. It was, therefore, necessary to expend considerable time and effort reviewing in depth the trial transcript.

**8.** On cross-examination, Wright's trial counsel questioned Agent Corrigan about the existence of notes from the 8 August Interview:

Q: Did you take notes of these discussions?
A: I may have.
Q: Do those notes exist?
A: No.
Q: What happened to those notes?
A: I probably destroyed them.
Q: You destroyed them?
A: That's correct.
Tr. at 67.

At the Post–Trial Motion Hearing, the Government certified that it did deliver to Wright FBI Form FD–302 summaries of the 8 August Interview (the "8 August 302 Summaries"). 10 Feb. Tr. at 2.

drugs was Agent Monroe acting undercover. *Id.* at 38, 60.

According to Agent Corrigan, Wright continued that "the deal had been set up the previous day, August 7. He said that he had made arrangements with ... Rex to sell—actually he wasn't going to sell the entire six ounces, to bring the six ounces to the Atlantic City area. What he did was he had a second individual bring the heroin down in a separate vehicle. N[ea]l Wright stayed at the Econo–Lodge Hotel in Atlantic city." *Id.* at 38.

Agent Corrigan continued that Wright "stated that on August 8 he was picked up by ... Rex in ... Rex's pickup truck. That ... Rex picked him up at ... Wright's hotel. They then went and met this other individual, who gave the heroin to ... Wright. From that point, they drove to the Comfort Inn...." *Id.* at 39. Agent Corrigan testified that Wright stated that the "other individual" who gave him the heroin was "a person who he believed to be an Indian, probably an illegal alien, that he knew by the name 82. He stated this individual's a taxicab driver in New York and the number 82 is assigned to his taxicab in New York." *Id.* at 39–40. Wright told Agent Corrigan "that 82 was a person who[m] he had enlisted to bring the heroin from New York to Atlantic City on N[ea]l Wright's behalf. He told [Agent Corrigan] that he was going to pay 82 approximately a thousand dollars ... for this service."[9] *Id.* at 42.

Agent Corrigan testified that when Wright and Rex arrived at the Comfort Inn, they were met by Agent Monroe. *Id.* at 40. According to Corrigan, "Wright told [him] he instructed ... [Rex] to carry the package containing the heroin into the hotel." *Id.* Wright stated that once Agent Monroe had examined the heroin and left Room 419, "Wright became aware that there were law enforcement agents who were about to arrest

him and he ran out the door ... and was apprehended by the FBI in the hallway." *Id.*

Agent Corrigan testified that Wright then told him of another heroin transaction in which he had been involved in January 1991 (the "January Sale"). Wright "stated that in January of 1991 he had sold approximately two ounces of heroin to ... Agent Monroe...." *Id.* at 40–41. Wright stated that "later he was contacted by ... Rex and told that the heroin was no good. He stated that at that time he was unable to either pay the money back or make good on the heroin...." *Id.* at 41.

According to Agent Corrigan, Wright then "stated that in June of 1991 he contacted or he attempted to contact ... Rex ([the "June 1991 Solicitation"]).[10] He was later successful in reaching ... Rex in an effort to reestablish a relationship whereby he would provide heroin to ... Rex and ... Rex would sell that heroin in Atlantic City." *Id.* According to Agent Corrigan, Wright "stated that after contacting ... Rex on July 23 in New York City, he gave ... Rex approximately one ounce of heroin as partial repayment for the two ounces of bad heroin [from the January Sale (the "23 July Transfer").]" *Id.*

Agent Corrigan testified that, during the 8 August Interview, Wright also described other persons involved in his plan to distribute heroin. Wright stated "he got the heroin from two Nigerians in New York City and that he ... owed these Nigerians money for the heroin." *Id.* Also, as stated, Wright described the role of "82" in the plan. *Id.*

Also during Agent Corrigan's testimony, the Government introduced three tape-recordings of phone conversations between Wright and Rex, and transcripts of these conversations.[11] According to Agent Corrigan, the first recording was arranged by

---

**9.** The Government argued 82 was in fact Mahadik. *See* Tr. at 178.

**10.** During re-direct examination, Agent Corrigan testified that Wright stated that in "June of 1991, he attempted to get back in contact with ... Rex to ... resume or initiate his selling heroin to ... Rex." Tr. at 89.

**11.** The jury was instructed that "[i]f there [was] a conflict between the tape recording and the transcript, [it was] to follow the tape recording." Tr. at 222–23.

Agent Corrigan relaying a 26 June 1991 phone call from Rex to Wright, and then listening to and recording the ensuing conversation (the "26 June Recording"). *Id.* at 47–48. Agent Corrigan stated, based on his personal interview with Wright, that he recognized Wright's voice in the 26 June Recording. *Id.* at 48.

Wright, responding to the name "Pookie," refused to speak in specific terms during the 26 June Recording, but he arranged a meeting with Rex. 26 June Recording at 8–9. According to the 26 June Recording, Wright sought the meeting to make amends for some unspecified wrong done to Rex by Wright. 26 June Recording at 2–4.

After introducing the 26 June Recording and accompanying transcript, the Government introduced a recording of a 7 August 1991 phone conversation between Rex and Wright, made while Rex was in Agent Corrigan's office (the "First 7 August Recording"). Tr. at 50. A transcript of the First 7 August Recording was also introduced. *Id.* Agent Corrigan testified that the statements attributed to Wright in the transcript of the First 7 August Recording were in fact made by Wright. *Id.* at 51–52.

In the First 7 August Recording, Wright and Rex again spoke in non-specific terms of the transfer of certain items from Wright to Rex:

Wright: I'm gonna give you one that I owe you.

Rex: Right.

Wright: Plus I'm gonna hit you with one.

Rex: Okay.

Wright: That you owe me.

Rex: Okay.

Wright: So you'll be comin' for four.

. . . . .

Wright: Take it man it'll be opening a door for us. You understand what I mean?

Rex: Right.

Wright: That way after this with me and you.... We don't need no more. You don't need to bring me no more money. You just you know I just you know after

you take care what I give you.... I'll send it. And you just give it to me later. First 7 August Recording at 3–4, 14. In the First 7 August Recording, Wright also describe the role of a third party in the transaction; Wright stated: "What I can promise you I can I talk to Cheryl and I'll pay her." *Id.* at 6.

After introducing the First 7 August Recording, the Government introduced a recording of a conversation between Rex and Wright which took place later on 7 August 1991 (the "Second 7 August Recording"). In the Second 7 August Recording, Wright and Rex arranged a meeting for the next day, 8 August 1991, at 9:00 o'clock A.M. Second 7 August Recording at 3.

The Second 7 August Recording contains more information, though in vague terms, regarding the purpose of the meeting between Wright and Rex:

Wright: How much ... do he got?

. . . . .

Rex: Cash?

Wright: Yeah.

Rex: He got like about twenty-five thousand.

Wright: Ready to do somethin'?

Rex: Yeah. That's what he was gonna do....

Wright: No why he don't wanna do two with me....

Rex: Well, you know ... he probably would do more with you.... I just told him about the duce.

. . . . .

Wright: [B]ut he said he can work with that, right?

. . . . .

Wright: So what I'm doing right now, ... I'm tryin' to see if I can round up, round up, round up somebody to go...."

. . . . .

Rex: What you mean, come down here?

Wright: Yeah.... If I can round up somebody to come down there, I'll come, and you know, move, with you know.

. . . . .

Wright: What could you get him to take?

Rex: What do you mean ...?

Wright: How many, you get him to take?

Rex: Well I told him two, but now, see 'cause he was gonna do like four.

Wright: Ah, if he gonna do four I'm, I'm still gonna send you with the one that I, you understand?

. . . . .

Rex: So we're talkin' like six?

Wright: It's up to you.

Second 7 August Recording at 4–8.

The Government's case continued with the testimony of Thomas Zyckowski ("Agent Zyckowski"), a special agent for the FBI who was involved in Wright's arrest on 8 August 1991. Agent Zyckowski testified that when he entered Room 419 after Wright was arrested, his "first observation was on the bed closest to the window six small packages of a brown powdery substance in plastic, little plastic bags, as well as a larger white plastic bag." Tr. at 91. Zyckowski testified that the substance and packaging introduced into evidence by the Government as exhibit seven ("G–7") was the substance and packaging he observed in Room 419 on 8 August 1991. *Id.* at 92.

After the testimony of Agent Zyckowski, the Government introduced the testimony of Edward Manning ("Manning"), a forensic chemist employed by the United States Drug Enforcement Administration (the "DEA"). Manning testified that it was his job to "analyze substances that come into the lab to determine whether or not they contain a controlled substance." *Id.* at 98. Manning testified that he had examined G–7, and that G–7 "was found to contain a controlled substance, namely heroin...." *Id.* at 100. Manning stated that the material in G–7 was 29% pure heroin. *Id.* Manning further testified that "the net weight of the material, when received for analysis" was 109.9 grams. *Id.* at 100–101.

The Government next introduced the testimony of James B. Darcy, special agent for the FBI ("Agent Darcy"). Agent Darcy testified that the price of one ounce of heroin in the Atlantic City area in August 1991 was "between six and seven thousand dollars." *Id.* at 114. Agent Darcy also accounted for the chain of possession of G–7. *Id.* at 115–16.

After the testimony of Agent Darcy, the Government offered the testimony of Agent Monroe, who, as stated, posed as the drug buyer with whom Wright and Rex arranged the 8 August Sale. Agent Monroe first testified regarding the events surrounding the January Sale.[12] Agent Monroe testified that on the night of 10 January 1991, he "was to meet an individual by the name of Pookie, nickname Pookie, real name N[ea]l Wright, at the Newark Airport Marriott over at the Newark Airport [ (the "Airport Marriott") ], at which time [Agent Monroe] was to purchase two ounces of heroin from him." *Id.* at 122. While on the witness stand, Agent Monroe identified Wright as the person whom he knew as "Pookie."[13] *Id.*

Monroe testified that on 10 January 1991, when he arrived at the Airport Marriott, he waited in a room until Rex and Wright arrived. Rex then "went downstairs and obtained a sample of the heroin from [Wright] and brought that heroin back, the sample back to the room, at which time it was tested." *Id.* Agent Monroe testified that after he had tested the heroin, he

went downstairs to the bar area of the hotel and ... met with an unidentified black male who showed me the suspected heroin and I showed him the money.... Then we discussed prices. We discussed future transactions, trying to set up some type of heroin network between New York and Atlantic City and he assured me it could be done, at which point we agreed. We agreed to do the buy. I gave him the money, he gave me the drugs. Shortly after that, ... Wright came over and

12. Agent Monroe testified that he was wearing a body wire at the January Sale, but that the recording from that body wire "didn't come out. It's inaudible." Tr. at 160.

13. Later, during his cross-examination, Agent Monroe stated that 'Pookie' "was the nickname that ... Rex used when referring to ... Wright" both at the January Sale and at the 8 August Sale. Tr. at 156.

joined the conversation and ... I told him that I wasn't pleased, because when I looked at the heroin, it wasn't as white as it should have been. He assured me it was good and we talked about doing future transactions.

I asked him, you know, if he would give me a good price on future transactions. He said yes. Again, we discussed trying to set up some type of heroin network between Atlantic City and New York. He advised me to contact him through ... Rex....[14]

*Id.* at 123–24.

Agent Monroe then turned to the events surrounding the 8 August Sale at the Comfort Inn. According to Agent Monroe, he met Rex and Wright in the parking lot of the Comfort Inn. Rex and Wright arrived together in a pickup truck which Rex was driving. *Id.* at 126. Agent Monroe testified that "[w]hen they got out of the truck, ... Rex was carrying a plastic red and white plastic type bag which had some objects in it...." *Id.*

Agent Monroe, Wright and Rex proceeded to Room 419. According to Agent Monroe, when Wright entered Room 419, he "appeared to be a little nervous" and "proceeded to lock the adjoining room door." *Id.* at 127.

Agent Monroe testified that Rex then started emptying the contents of the red and white plastic bag onto a bed. "[A]t the bottom of the bag were six plastic bags containing a brown powdery substance." *Id.* According to Agent Monroe, after the six small bags were on the bed, Wright "made a comment about one, indicating that it was either short or light. He indicated that bag was for ... Rex." [15] *Id.* at 128.

According to Agent Monroe, he and Wright then "again talked about setting up future heroin deals between New York City and Atlantic City, trying to set up some type of network." *Id.* Agent Monroe testified that "Wright told [him] that future deals would be done, he would send another individual down with the drugs and he would come down a day or so later to pick up the money." [16] *Id.* Agent Monroe stated that shortly after Wright made this statement, his arrest was effected. *Id.* at 128–29.

Agent Monroe testified that, during the 8 August Sale, he was wearing a body wire connected to recording equipment. *Id.* at 130. The Government introduced the tape from that recording, and the transcript of the recording (the "8 August Recording"), during Agent Monroe's testimony at trial.[17] *Id.* at 130–33. According to the 8 August Record-

---

**14.** During re-direct examination, Agent Monroe testified that Wright and the unidentified black male left together after the January Sale. Tr. at 158.

**15.** During re-direct examination, Agent Monroe testified that while Rex was emptying the contents of the plastic bag onto the bed, Wright "was describing some of the bags indicating that ... this is the smallest one, indicating why the bag was—to me that meant it was a little light, it wasn't a true ounce." Tr. at 158.

**16.** During re-direct examination, Agent Monroe confirmed that Wright stated: "Hey, I'll send a man down with it and I'll come down the next day to collect the money." Tr. at 158.

**17.** During trial, the Government offered both the original 8 August Recording, on reel-to-reel tape, and a cassette copy thereof, into evidence. Both were admitted, but only the cassette version was played for the jury during trial. Tr. at 130–32. Wright appears to argue that the playing of the cassette version of the 8 August Recording violated the 'best evidence rule,' Fed.R.Evid. 1002. Wright Response at 7 n. 6.

Federal Rule of Evidence 1002 provides: "To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress." Fed.R.Evid. 1002. However, Federal Rule of Evidence 1003 provides: "A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." Fed.R.Evid. 1003. In the instant case, there was no genuine question as to the authenticity of the original 8 August Recording and the admission of the duplicate cassette was in no way unfair to Wright. Moreover, the Government adequately explained why the cassette copy was played for the jury, pointing out that "the tape playing equipment [in the courtroom] will only handle cassettes and it wouldn't handle ... reel-to-reel type of tape." Tr. at 132. Under these circumstances, the admission of the cassette copy of the 8 August Recording did not violate Rule 1002.

ing, Wright described the contents of the red and white plastic bag as Rex emptied them onto the bed in Room 419:

> Rex: How they got this thing tied up. It's a lot of powder....
>
> Wright: Smallest bag. Smallest one.
>
> Rex: Smallest one.
>
> Wright: (Unintelligible) touch it man, I don't like (unintelligible). How many's there, how many you got in your hand?
>
> Agent Monroe: I got one, two, three, four, lookin' good.
>
> Wright: That's (unintelligible).
>
> Agent Monroe: That's yours?
>
> Wright: And this here, this is only one and a half, because whe—, where he, where I was, he didn't have, you know what I mean. But don't worry about it, I, I was gonna send you, I was gonna let you, if you came back with me, I was gonna let me, what ya call it came, come back....

8 August Recording at 4–5.

The 8 August Recording also indicates Wright, Rex and Agent Monroe discussed future dealings:

> Wright: We, in the future, I got some that supposed to be comin' that's white ... hmm killer, kill everything.
>
> Agent Monroe: Okay. Well how much you gonna charge me for an ounce in the future? ...
>
> Wright: Let me tell you somethin', from, if everything go right, you know like the way I'm plannin' it ... like I told [Rex], I'm not gonna be bringing it down for cash, I'm gonna send it, you know what I mean, and we just got to, you know we'll work out a, a decent price. You know I'll be sendin' it and gettin' my money the next day.... I'll send a man down, I say look, just take that down there. Then I might come the next day and come get the money.... You know, so that we can, you know what I mean, establish somethin'.
>
> Agent Monroe: Okay. How much can you do? Can you do another six ounces?
>
> Wright: I can do anything.

8 August Recording at 5–6. The 8 August Recording indicates that shortly after this exchange, Agent Monroe left Room 419 and Wright was arrested by the FBI. *Id.* at 7–8.

*Discussion*

A. *Judgment of Acquittal under Fed. R.Crim.P. 29(c)*

Pursuant to Federal Rule of Criminal Procedure 29(a):

> The court on a motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

Fed.R.Crim.P. 29(a). Rule 29(c) provides that if the defendant is convicted, "a motion for judgment of acquittal may be made or renewed within 7 days after the jury is discharged or within such further time as the court may fix during the 7–day period." Fed.R.Crim.P. 29(c).

■ "A defendant challenging the sufficiency of the evidence bears a heavy burden." *United States v. Casper,* 956 F.2d 416, 421 (3d Cir.1992); *see United States v. McGlory,* 968 F.2d 309, 321 (3d Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1388, 122 L.Ed.2d 763 (1993); *United States v. Gonzalez,* 918 F.2d 1129, 1132 (3d Cir.1990), *cert. denied,* 499 U.S. 982, 111 S.Ct. 1637, 113 L.Ed.2d 733 (1991). The challenged verdict must be sustained if "a reasonable jury believing the [G]overnment's evidence could find beyond a reasonable doubt that the [G]overnment proved all the elements of the offenses." *United States v. Salmon,* 944 F.2d 1106, 1113 (3d Cir.1991), *cert. denied sub nom Washington v. United States,* — U.S. —, 112 S.Ct. 1213, 117 L.Ed.2d 451 (1992); *see United States v. Terselich,* 885 F.2d 1094, 1097 (3d Cir.1989) (citing *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)); *United States v. Samuels,* 741 F.2d 570, 575 (3d Cir.1984).

Stated differently, "the trial court [is] obliged to uphold the jury's verdict unless no rational jury could have concluded beyond a

reasonable doubt" that the defendant committed the crimes charged. *United States v. Ashfield*, 735 F.2d 101, 106 (3d Cir.), *cert. denied sub nom Storm v. United States*, 469 U.S. 858, 105 S.Ct. 189, 83 L.Ed.2d 122 (1984); *see McGlory*, 968 F.2d at 322. As the Supreme Court has stated, "such a decision will be confined to cases where the prosecution's failure is clear." *Burks v. United States*, 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978); *see Government of the Virgin Islands v. Brathwaite*, 782 F.2d 399, 404 (3d Cir.1986).

■ In making this determination, "the court must view the evidence and the inferences logically deducible therefrom in the light most favorable to the [G]overnment...." *United States v. McNeill*, 887 F.2d 448, 449–50 (3d Cir.1989), *cert. denied* 493 U.S. 1087, 110 S.Ct. 1152, 107 L.Ed.2d 1055 (1990); *see Burks*, 437 U.S. at 17, 98 S.Ct. at 2150; *Salmon*, 944 F.2d at 1113. "When examining the sufficiency of the evidence, the court reviews the totality of the circumstances." *United States v. Leon*, 739 F.2d 885, 891 (3d Cir.1984); *see Government of the Virgin Islands v. Greene*, 708 F.2d 113, 115 (3d Cir.1983), *cert. denied*, 465 U.S. 1008, 104 S.Ct. 1004, 79 L.Ed.2d 236 (1984). "The evidence is to be viewed not in isolation but in conjunction." *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir.1984).

■ As indicated, the jury's verdict need only be supported by a threshold quantum of evidence in order to be sustained. "The evidence need not unequivocally point to the defendant's guilt as long as it permits the jury to find the defendant guilty beyond a reasonable doubt." *United States v. Pungitore*, 910 F.2d 1084, 1129 (3d Cir.1990), *cert. denied*, 500 U.S. 915, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991); *see Leon*, 739 F.2d at 891. "Only when the record contains no evidence, regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt," may a verdict be overturned. *McNeill*, 887 F.2d at 451.

"In determining whether the evidence is sufficient, [the court] will not weigh the evidence or determine the credibility of witnesses." *Casper*, 956 F.2d at 421; *see Glasser*, 315 U.S. at 80, 62 S.Ct. at 469; *McGlory*, 968 F.2d at 321; *Mariani*, 725 F.2d at 865. "Nor will [the court] substitute its own subjective interpretation of the evidence for that of the jury." *United States v. Villard*, 700 F.Supp. 803, 811 (D.N.J.1988), *aff'd*, 885 F.2d 117 (3d Cir.1989).

In the instant context, in order for the verdict to be sustained, the evidence must have been sufficient to sustain convictions under 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846. *See* Indictment.

■ Pursuant to section 841(a)(1), it is "unlawful for any person knowingly or intentionally to ... possess with intent to ... distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). "The necessary elements to sustain a conviction for possession of [a controlled substance] with intent to distribute are that the defendant (1) knowingly (2) possessed the [controlled substance] (3) with intent to distribute it." *United States v. Sanchez*, 961 F.2d 1169, 1175 (5th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 330, 121 L.Ed.2d 248 (1992); *see Salmon*, 944 F.2d at 1113; *United States v. Olivier–Becerril*, 861 F.2d 424, 426 (5th Cir. 1988); *United States v. Samad*, 754 F.2d 1091, 1096 (4th Cir.1984).

The Third Circuit has held with respect to the 'possession' element:

It is well settled that when a defendant is charged with possession of a controlled substance with intent to distribute it in violation of 21 U.S.C. § 841(a)(1), possession can be actual or constructive. Constructive possession may be shown through either direct or circumstantial evidence. Constructive possession may be found if the evidence shows that the defendant "was knowingly in a position, or had the right to exercise 'dominion and control' of the drug either personally or through others."

*United States v. Martorano*, 709 F.2d 863, 866 (3d Cir.) (quoting *United States v. Raper*, 676 F.2d 841, 847 (D.C.Cir.1982)), *cert. denied*, 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983); *see Sanchez*, 961 F.2d at 1175; *United States v. Martinez*, 922 F.2d 914, 923 (1st Cir.1991); *United States v. Torres*, 901 F.2d 205, 221 (2d Cir.), *cert. denied sub nom*

*Cruz v. United States,* 498 U.S 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990); *United States v. Peart,* 888 F.2d 101, 105 (11th Cir.1989); *United States v. Damsky,* 740 F.2d 134, 139 (2d Cir.), *cert. denied,* 469 U.S. 918, 105 S.Ct. 298, 83 L.Ed.2d 233 (1984).

■ The Government's proof of 'knowing' possession similarly "can be based upon inferences from the surrounding circumstances." *Peart,* 888 F.2d at 104; *see United States v. Cruz–Valdez,* 773 F.2d 1541, 1546 (11th Cir.1985), *cert. denied sub nom Ariza–Fuentas v. United States,* 475 U.S. 1049, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986); *United States v. Koua Thao,* 712 F.2d 369, 371 (8th Cir.1983); *United States v. Vera,* 701 F.2d 1349, 1358 (11th Cir.1983). "Direct evidence of intent is not necessary...." *Peart,* 888 F.2d at 104. For example, "[m]ere possession of a substantial quantity of narcotics is sufficient evidence to support a finding that a defendant knowingly possessed the narcotics." *United States v. Collins,* 764 F.2d 647, 652 (9th Cir.1985); *see United States v. Ferguson,* 935 F.2d 1518, 1526 (7th Cir.1991).

■ Also, "the law is settled that a defendant need not know the exact nature of a drug in his possession to violate [section] 841(a)(1); it is sufficient that he be aware that he possesses some controlled substance." *United States v. Morales,* 577 F.2d 769, 776 (2d Cir.1978); *see United States v. Ramirez–Ramirez,* 875 F.2d 772, 774 (9th Cir.1989); *United States v. Kairouz,* 751 F.2d 467, 468 (1st Cir.1985).

■ As with the other elements of an offense under section 841(a)(1), "[i]ntent to distribute may be proven by circumstantial evidence." *United States v. Pigrum,* 922 F.2d 249, 254 (5th Cir.), *cert. denied sub nom Allen v. United States,* 500 U.S. 936, 111 S.Ct. 2064, 114 L.Ed.2d 468 (1991); *see United States v. Adams,* 759 F.2d 1099, 1113 (3d Cir.) ("The evidence of [the defendant's] receipt of three ounces of speed over a short period of time, coupled with statements from the taped conversations, permitted the jury to infer that [the defendant] was distributing drugs."), *cert. denied sub nom Alongi v. United States,* 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985).

"In fact, the intent to distribute may be inferred solely from possession of a large quantity of controlled substances." *Pigrum,* 922 F.2d at 254; *see United States v. Ojebode,* 957 F.2d 1218, 1223 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1291, 122 L.Ed.2d 683 (1993); *United States v. Brown,* 921 F.2d 785, 792 (8th Cir.1990); *United States v. Prieto–Tejas,* 779 F.2d 1098, 1101 (5th Cir.1986). Similarly, "[e]vidence of the street value and the purity of the controlled substance can also be relevant to the possessor's intent to distribute." *Pigrum,* 922 F.2d at 254. Also, "[i]ntent to distribute has been inferred in cases where small amounts of drugs have been packaged in a manner consistent with distribution." *United States v. Garrett,* 903 F.2d 1105, 1113 (7th Cir.) (possession of cocaine in 38 individual packages supported inference of intent to distribute in spite of small aggregate amount of cocaine), *cert. denied,* 498 U.S. 905, 111 S.Ct. 272, 112 L.Ed.2d 227 (1990); *see United States v. Gooding,* 695 F.2d 78, 84 (4th Cir.1982) (approximately 25 grams of cocaine "packaged in a way typical ... of the packaging used by narcotics distributors" supported inference of intent to distribute).

Intent to distribute may be inferred from coded orders and offers in taped conversations, without the necessity of an expert to de-code the conversations. *See McGlory,* 968 F.2d at 324 (jury could rationally infer that taped references to the transfer of "slippers" were actually references to transfer of heroin); *United States v. Theodoropoulos,* 866 F.2d 587, 593 (3d Cir.1989) (jury could rationally infer that references to sale of "television sets" were actually references to sale of cocaine); *United States v. Giraldo,* 822 F.2d 205, 213 (2d Cir.) (Government was entitled to argue that tape-recorded requests for "bread" and "chicken" were in fact requests for cocaine.), *cert. denied,* 484 U.S. 969, 108 S.Ct. 466, 98 L.Ed.2d 405 (1987); *See also Samuels,* 741 F.2d at 575 (Jury was entitled to infer that defendant's statement that he would "drop something off" indicated defendant intended to drop off money to be used in drug transaction.); *United States v. Washington,* 677 F.2d 394, 396 (4th Cir.) (Government was entitled to argue, without the aid of experts, that slips of paper and address book

containing names and corresponding figures was typical of "how drug dealers do business...."), *cert. denied sub nom Williams v. United States,* 459 U.S. 854, 103 S.Ct. 120, 74 L.Ed.2d 105 (1982).

Turning to section 846, that section makes it unlawful for "[a]ny person [to] attempt[ ] to commit any offense defined in this subchapter...." 21 U.S.C. § 846. In the instant case, Count I of the Indictment charges Wright with conspiring with Mahadik and with others to violate section 843(a)(1) by possessing with intent to distribute and distributing heroin. *See* Indictment at 1.

The Third Circuit has recently approved the following recitation of the elements of a charge of conspiracy to distribute, or possess with intent to distribute, a controlled substance:

> The Government has to prove ... in order to make out its conspiracy charge that there was an agreement for an illegal purpose, namely, to distribute or possess with intent to distribute the ... heroin; that that conspiracy was wilfully formed and was existing on or about the time alleged in the indictment and that ... the defendant[ ] wilfully became a member of the conspiracy with the intent of furthering its unlawful purpose....

*United States v. Price,* 13 F.3d 711, 724 (3d Cir.1994) (quoting with approval instructions of district court to jury); *see McGlory,* 968 F.2d at 321; *Salmon,* 944 F.2d at 1113 ("A conspiracy conviction requires that one agreed to commit an unlawful act and intended to commit the underlying offense."); *United States v. Gonzalez,* 918 F.2d 1129, 1134 (3d Cir.1990) (same); *United States v. American Investors of Pittsburgh, Inc.,* 879 F.2d 1087, 1100 (3d Cir.1989) (same), *cert. denied,* 493 U.S. 955, 110 S.Ct. 368, 107 L.Ed.2d 354 (1989).

■ As indicated by this standard, a conspiracy conviction under section 846 "requires that one had 'knowledge of the illegal objective contemplated by the conspiracy.'" *Salmon,* 944 F.2d at 1113 (citation and emphasis omitted); *see United States v. Wexler,* 838 F.2d 88, 91 (3d Cir.1988). Also, the Government must show that the alleged conspirators "shared a 'unity of purpose,' the

intent to achieve a common goal, and an agreement to work together toward that goal." *Wexler,* 838 F.2d at 90–91; *see McGlory,* 968 F.2d at 321.

"[A]n overt act [in furtherance of the conspiracy] is not a necessary element for a violation of 21 U.S.C. § 846." *Price,* 13 F.3d at 724; *see United States v. Johnstone,* 856 F.2d 539, 542 (3d Cir.1988) ("It is neither an element of 21 U.S.C. § 846 nor a constitutional requirement that a defendant have committed an overt act in furtherance of the conspiracy."); *United States v. Bey,* 736 F.2d 891, 894 (3d Cir.1984) (same).

■ "The elements of a conspiracy may be proven entirely by circumstantial evidence." *Wexler,* 838 F.2d at 90; *see McGlory,* 968 F.2d at 321; *Gonzalez,* 918 F.2d at 1134. As the Circuit has elaborated:

> The existence of a conspiracy can be inferred "from evidence of related facts and circumstances from which it appears as a reasonable inference, that the activities of the participants ... could not have been carried on except as the result of a preconceived scheme or common understanding."

*McGlory,* 968 F.2d at 321 (quoting *United States v. Kapp,* 781 F.2d 1008, 1010 (3d Cir. 1986)); *see United States v. Torres,* 862 F.2d 1025, 1027 (3d Cir.1988) (citing same). The Circuit has observed, moreover, that "[a] conspiracy is by its very nature clandestine. Thus circumstantial evidence is sometimes the sole support for a conviction." *McGlory,* 968 F.2d at 322.

■ "The [G]overnment need not prove the existence of a formal agreement...." *United States v. Simmons,* 918 F.2d 476, 484 (5th Cir.1990); *see United States v. Nolan,* 718 F.2d 589, 595 (3d Cir.1983). Rather, "it is enough that the parties have a tacit understanding to carry out the prohibited conduct." *United States v. Nusraty,* 867 F.2d 759, 763 (2d Cir.1989); *see Gonzalez,* 918 F.2d at 1134; *United States v. Rubin,* 844 F.2d 979, 984 (2d Cir.1988). Similarly, "[k]nowledge of all the particular aspects, goals, and participants of a conspiracy ... is not necessary to sustain a conviction" under section 846. *Adams,* 759 F.2d at 1114; *see*

*Nusraty,* 867 F.2d at 763; *Theodoropoulos,* 866 F.2d at 593.

Because the existence of a conspiratorial agreement may be inferred from circumstantial evidence, the Third Circuit has held that "references to a third party made in a taped conversation ... sufficed to support a conviction for conspiracy on the ground that [the alleged conspirator] knew he was part of a larger drug operation." *United States v. Padilla,* 982 F.2d 110, 114 (3d Cir.1992); *see Theodoropoulos,* 866 F.2d at 594.

▮ Where, as here, the indictment alleges that a defendant conspired with a known co-conspirator "and with others," Indictment at 1, "the identity of the other members of the conspiracy is not needed, inasmuch as one person can be convicted of conspiring with persons whose names are unknown." *United States v. Allen,* 613 F.2d 1248, 1253 (3d Cir.1980) (quoting *Rogers v. United States,* 340 U.S. 367, 375, 71 S.Ct. 438, 443, 95 L.Ed. 344 (1951)); *see Government of Virgin Islands v. Hoheb,* 777 F.2d 138, 140 (3d Cir.1985) (Even though only named co-conspirator was acquitted, defendant's conspiracy conviction could be sustained "where it is alleged and proven that the defendant conspired with persons unknown"). Therefore, "the question is not whether there was sufficient evidence that [Wright] conspired with [Mahadik], but whether there was sufficient evidence that he conspired with some other person." *Allen,* 613 F.2d at 1253.

▮ With respect to both section 841(a)(1) and section 846, the testimony of an undercover agent involved in investigating the defendant, if it reasonably establishes all the elements of the offense, is by itself sufficient to sustain a conviction. *See United States v. Parrado,* 911 F.2d 1567, 1570 (11th Cir.1990) (section 846 conviction sustained over defendants' argument that Government "presented only testimony by agents involved in the operation"; no "more reliable forms of evidence" are required by law to sustain conviction), *cert. denied,* 498 U.S. 1104, 111 S.Ct. 1005, 112 L.Ed.2d 1088 (1991); *United States v. Tucker,* 552 F.2d 202, 211 (7th Cir.1977) (testimony of single Government agent was sufficient to sustain conviction under section 841(a)(1), notwithstanding that defendant's testimony contradicted agent's testimony); *United States v. Martin,* 526 F.2d 485, 486 (10th Cir.1975) (same).

▮ Applying these principles to the facts at bar, it is apparent that the evidence adduced at trial was at least sufficient to support a conviction under both section 841(a)(1) and section 846. As Wright's trial attorney conceded at the Sentencing Hearing, "the evidence was overwhelming...." Sentencing Tr. at 40–41.

With regard to the possession element of section 841(a)(1), the evidence was more than adequate to support the inference that Wright exercised "dominion and control" over the heroin at the 8 August Sale. *Martorano,* 709 F.2d at 866. Agent Corrigan testified that, during the 8 August Interview, Wright "stated that he had, in fact, delivered approximately six ounces of heroin earlier that day to the Comfort Inn." Tr. at 38. According to Agent Corrigan, Wright explained that "he had a second individual bring the heroin down" to Atlantic City. *Id.* Agent Corrigan also told the jury that Wright admitted that the other individual "gave the heroin to ... Wright" after Wright and Rex met on the morning of 8 August 1991. *Id.* at 39.

According to Agent Corrigan's testimony, Wright explained that this other individual, to whom Wright referred as "82" was enlisted by Wright "to bring the heroin from New York to Atlantic City on ... Wright's behalf." *Id.* at 42. According to Agent Corrigan, Wright also stated during the 8 August Interview that, when he and Rex arrived at the Comfort Inn on 8 August 1991, "he instructed ... [Rex] to carry the package containing the heroin into the hotel." *Id.* Agent Corrigan's testimony as to Wright's statements provides a sufficient basis on which the jury could rationally have concluded beyond a reasonable doubt that Wright exercised dominion and control over the heroin.

Agent Monroe's testimony established that, when in Room 419 during the 8 August Sale, Wright continued to exercise dominion and control over the heroin. Specifically, Agent Monroe testified that Wright de-

scribed the bags of heroin and indicated that one was "short or light." *Id.* at 128; *see id.* at 158. Agent Monroe's testimony as to Wright's conduct in this regard was confirmed by the 8 August Recording. 8 August Recording at 4–5. The jury could rationally have inferred that Wright would not have known one of the bags contained less heroin than the others unless he exercised control over the bags. *See Martorano,* 709 F.2d at 866.

Agent Monroe also testified that Wright indicated the "light" bag was for Rex. Tr. at 128. This description of Wright's conduct was also confirmed by the 8 August Recording. 8 August Recording at 4–5. It was entirely reasonable for the jury to infer from Wright's grant of the bag to Rex that Wright exercised dominion and control over the bag and all the heroin present at the 8 August Sale. Based on this evidence, there was sufficient evidence upon which the jury could have found, beyond a reasonable doubt, that Wright 'possessed' the heroin for the purposes of section 841(a)(1). *See Martorano,* 709 F.2d at 866.

Equally apparent is that the evidence in the record supports the inference that Wright 'knowingly' possessed the heroin. As stated, Agent Corrigan testified that, during the 8 August Interview, Wright stated that he had delivered six ounces of "heroin" to the Comfort Inn on 8 August 1991. Tr. at 38. Indeed, throughout the 8 August Interview, Wright indicated he possessed the heroin with full knowledge of the fact he possessed it, and that it was heroin. Wright's 'knowing' possession of the narcotics is also supported by the substantial quantity of narcotics he possessed. *See Collins,* 764 F.2d at 652.

The inference that Wright knowingly possessed a controlled substance was also sup-ported by his actions in preparation for and during the 8 August Sale. During all of the recorded conversations between himself and Rex, Wright spoke in coded terms of the transaction which would take place at the 8 August Sale.[18] *See* First 7 August Recording at 3–4; Second 7 August Recording at 4–8. During the Second 7 August Recording, Wright indicated his willingness to accept twenty-five thousand dollars for the goods he would be bringing to the 8 August Sale. 7 August Recording at 4. Finally, Agent Monroe testified that when Wright entered Room 419 during the 8 August Sale, he "appeared nervous" and locked the adjoining room door. Tr. at 127. The jury was entitled to infer from this behavior that Wright knew at the 8 August Sale that he possessed a controlled substance. *See McGlory,* 968 F.2d at 324; *Peart,* 888 F.2d at 104.

The evidence offered by the Government at trial was also sufficient to support the jury's conclusion that Wright intended to distribute the heroin. According to Agent Corrigan's testimony, Wright stated during the 8 August Interview that he had, at the 8 August Sale, "delivered [the heroin] to a person that he had met through ... Rex." Tr. at 38. According to Agent Corrigan, Wright explained that "the deal had been set up the previous day, August 7. He said he had made arrangements with Rex to sell ... six ounces [in] the Atlantic City area." *Id.* at 38.

According to Agent Corrigan, Wright also stated that he had initiated contact with Rex in June 1991 "to resume or initiate his selling heroin to ... Rex." *Id.* at 89; *see id.* at 41. Wright explained that shortly thereafter, at the 23 July Transfer, "he gave ... Rex approximately one ounce of heroin as partial repayment for the two ounces of bad heroin" from the January Sale. *Id.* at 41.

---

**18.** Wright contends there was "no evidence at trial to prove that ... Wright was [the] 'Pookie'" who spoke in the recorded conversations with Rex. Wright Response at 4 & n. 2. Wright's contention in this regard is factually inaccurate. Agent Corrigan testified that the voice of "Pookie" he heard on the 26 June Recording matched the voice of Wright during the 8 August Interview. Tr. at 48. Agent Monroe also testified that 'Pookie' "was the nickname that ... Rex used when referring to ... Wright" both at the January Sale and at the 8 August Sale. *Id.* at 156; *see id.* at 122 (Agent Monroe testified that during the January Sale, he "was to meet an individual by the name of Pookie, nickname Pookie, real name Wright."). This testimonial evidence, if deemed credible, along with Wright's actions in conformity with "Pookie's" recorded words, was sufficient to support the jury's reasonable inference that Wright was in fact the "Pookie" named in the taped conversations.

The tape recordings of Wright's conversations with Rex also support the inference that Wright intended to distribute the heroin he possessed. During the First 7 August Recording, Wright spoke in coded terms of giving Rex something that he owed him. Wright also stated: "Plus, I'm gonna hit you with one," and that Rex would owe him for that. First August Recording at 3–4. Wright confirmed that Rex "would be comin' for four." *Id.* During the First 7 August Recording, Wright further stated that the upcoming 8 August Sale would "be opening a door" between himself and Rex. *Id.* at 14. Wright explained that he would, in the future, "send it" to Rex and collect payment later. *Id.*

Wright made similar comments during the Second 7 August Recording. Upon being told by Rex that Rex's connection had twenty-five thousand dollars, Wright asked: "Ready to do somethin'?" Second 7 August Recording at 4. Wright further asked: "[W]hy he don't wanna do two with me . . . ?" *Id.* Wright then asked what Rex could "get him to take," and indicated his willingness to "do four." *Id.* at 8. Wright also indicated he was "still gonna send [Rex] one . . . ." *Id.*

Though Wright's taped comments do not refer explicitly to a controlled substance, the jury could rationally have inferred that the non-specific references to items and transactions made by Wright were actually coded references to heroin and the sale thereof. *See McGlory,* 968 F.2d at 324; *Giraldo,* 822 F.2d at 213. Wright's tape-recorded comments therefore adequately support the jury's conclusion that Wright intended to distribute a controlled substance.

Wright's intention to distribute heroin also became apparent during the 8 August Sale itself. Agent Monroe testified that, during the 8 August Sale, Wright "talked about setting up future heroin deals between New York City and Atlantic City [and about] trying to set up some type of network." Tr. at 128. Wright explained the details of his proposed arrangement, stating that "he would send another individual down with the drugs and he would come a day or so later to pick up the money." *Id.; see id.* at 158. The 8 August Recording confirmed Agent

Monroe's testimony in this regard. The 8 August Recording also indicated that, in response to Agent Monroe's query as to whether Wright could "do another six ounces," Wright answered: "I can do anything." 8 August Recording at 5–6.

The jury's conclusion as to Wright's intent to distribute heroin was also supported by evidence relating to the amount, packaging and street value of the heroin involved in the 8 August Sale. Manning testified that G–7, recovered from Room 419 after the 8 August Sale, contained 109.9 grams of 29% pure heroin. Tr. at 100–101. Agent Darcy testified that the street value an ounce of heroin in the Atlantic City area during August 1991 was between $6,000 and $7,000. *Id.* at 114. From the purity, substantial amount and substantial street value of the heroin possessed by Wright, it would have been reasonable for the jury to infer that Wright intended to distribute the heroin contained in G–7. *See Ojebode,* 957 F.2d at 1223; *Pigrum,* 922 F.2d at 254.

The evidence offered at trial also revealed that the heroin recovered from Room 419 was contained in six small, individually wrapped packages. Tr. at 91 (testimony of Agent Zyckowski); *id.* at 128 (testimony of Agent Monroe). Because such packaging was "consistent with distribution," the jury could rationally have inferred that the heroin possessed by Wright in Room 419 was intended by Wright for distribution. *Garrett,* 903 F.2d at 1113.

 Wright argues that his conviction under section 841 "requires a d[e]fendant to have at least 100 grams of heroin." Wright Brief at 4–5; *see* Wright Response at 4–5. Based on this interpretation of the law, and the testimony of Manning that the total weight of G–7, with plastic bags, was 109.9 grams, Wright contends that the jury could not reasonably have found that the heroin contained in G–7 weighed 100 grams. *See* Wright Brief at 5.

Wright is correct in pointing out that section 841(b) provides a mandatory minimum sentence for a violation of section 841(a)(1) involving "100 grams or more of a mixture or substance containing a detectable amount of

heroin." 21 U.S.C. § 841(b)(1)(B)(i). Wright ignores, however, that "§ 841(b) is merely a penalty provision to be used at sentencing, after conviction of the substantive crime." *United States v. Gibbs*, 813 F.2d 596, 601 (3d Cir.1987), *cert. denied*, 484 U.S. 822, 108 S.Ct. 83, 98 L.Ed.2d 45 (1987); *see United States v. Schuster*, 948 F.2d 313, 315 (7th Cir.1991); *United States v. Sotelo–Rivera*, 931 F.2d 1317, 1319 (9th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1186, 117 L.Ed.2d 428 (1992). "The government would not be required to prove quantity as an essential element of the charge under § 841(a)(1) because quantity is not included as an element in the definition of the offense...." *United States v. Cross*, 916 F.2d 622, 623 (11th Cir.1990), *cert. denied*, 499 U.S. 929, 111 S.Ct. 1331, 113 L.Ed.2d 263 (1991); *see United States v. Valencia*, 957 F.2d 1189, 1197 (5th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 254, 121 L.Ed.2d 185 (1992); *Schuster*, 948 F.2d at 315; *United States v. Cox*, 934 F.2d 1114, 1121 (10th Cir.1991); *Sotelo–Rivera*, 931 F.2d at 1319; *United States v. Nelson*, 922 F.2d 311, 319 (6th Cir.1990), *cert. denied*, 499 U.S. 981, 111 S.Ct. 1635, 113 L.Ed.2d 731 (1991); *United States v. Luster*, 896 F.2d 1122, 1126 (8th Cir.1990). Therefore, the weight of the heroin mixture in G–7 is irrelevant to the sufficiency of the evidence to support Wright's conviction under section 841(a)(1); Wright's argument in this regard accordingly fails.[19]

The evidence offered by the Government provided a sufficient basis upon which the jury rationally could have found, beyond a reasonable doubt, that Wright knowingly possessed heroin with intent to distribute it. The evidence was therefore sufficient to sustain Wright's conviction under section 841(a)(1). *See Sanchez*, 961 F.2d at 1175. Accordingly, Wright's motion for acquittal is denied as to Count II.

The evidence adduced at trial was also adequate to support Wright's conviction under section 846 for engaging in a conspiracy to distribute, and to possess with intent to distribute, a controlled substance. In fact, as with respect to the evidence relating to section 841(a)(1), the evidence of Wright's wilful and knowing involvement in an agreement to violate drug laws was overwhelming.

According to Agent Corrigan's testimony, Wright himself indicated his wilful involvement in an illegal agreement during the 8 August Interview. According to Agent Corrigan, Wright stated that, in preparation for the 8 August Sale, he "enlisted [82] to bring the heroin from New York to Atlantic City." Tr. at 42. Wright also told Agent Corrigan "that he was going to pay 82 approximately a thousand dollars ... for this service." *Id.* Agent Corrigan further testified that Wright told him that he did in fact enlist "a second individual" to transport the heroin to Atlantic City on 8 August 1991, and that he obtained the heroin from this individual just before the 8 August Sale. *Id.* at 38–39. Wright also stated during the 8 August Interview that he "got the heroin from two Nigerians in New York City and that he ... owed these [persons] money for the heroin." *Id.* at 41. Wright's agreements with these third persons, whether known or unknown, would have been sufficient to sustain a conspiracy conviction under section 846. *See Allen*, 613 F.2d at 1253. While these agreements appear to have been formal, they need only have been tacit understandings to support a conspiracy conviction. *See Gonzalez*, 918 F.2d at 1134.

Wright's wilful involvement in a conspiracy was also independently demonstrated by evidence of his preparations for and conduct during the 8 August Sale. In the First 7 August Recording, Wright stated that after the upcoming 8 August Sale, he would "send" the contraband to Rex. First 7 August Recording at 14. The jury could rationally have inferred that Wright would not have been

---

**19.** In any event, Manning's testimony that G–7 weighed 109.9 grams would in fact support a reasonable inference that the heroin mixture contained in G–7 weighed over 100 grams. The weight of plastic bags is not so substantial that Manning's calculation of the weight of G–7 necessarily leads to the conclusion that the heroin mixture contained therein weighed less than 100 grams. *Cf. Ashfield*, 735 F.2d at 106 (trial court obliged to uphold verdict unless conclusion could not rationally have been reached). Therefore, it could rationally have been concluded, and was concluded, for sentencing purposes, that Wright did in fact possess with intent to distribute over 100 grams of heroin mixture in violation of section 841(b)(1)(B)(i).

able to "send" contraband to Rex without the aid of, and an agreement with, a third person. *See McGlory,* 968 F.2d at 321 (existence of conspiracy can be inferred from circumstances "from which it appears ... that the activities of the participants ... could not have been carried on except as the result of a preconceived scheme or common understanding").

Also during the First 7 August Recording, Wright made reference to the role of a specific third party in the upcoming drug transaction, stating: "I can talk to Cheryl and I'll pay her." First 7 August Recording at 6. This reference to a third party was sufficient to support a conspiracy conviction "on the ground that [Wright] knew he was part of a larger drug operation." *Padilla,* 982 F.2d at 114.

Wright made similar references to third parties during the Second 7 August Recording. Describing his plan to go to the Atlantic City area for the 8 August Sale, Wright stated: "I'm tryin' to see if I can round up ... somebody to go.... If I can round up somebody to come there, I'll come, and, you know, move, with you know." Second 7 August Recording at 6–7. This reference to a third party, and to that party's role in the transaction, likewise demonstrated Wright's knowing and wilful involvement in an agreement to distribute contraband. *See Padilla,* 982 F.2d at 114.

Wright's statements during the 8 August Sale, as recounted by Agent Monroe's testimony and in the 8 August Recording, also support the jury's finding as to the existence of a conspiracy. At the 8 August Sale, Wright indicated he was "plannin[g]" to set up a network for the distribution of heroin between New York and Atlantic City. 8 August Recording at 5–6; Tr. at 128. Wright stated that in future deals, "he would send another individual down with the drugs and he would come down a day or so later and pick up the money." Tr. at 128; *see* 8 August Recording at 5–6. Wright's statements indicate the involvement of other persons in a plan orchestrated by Wright for the sole and express purpose of distributing heroin. These statements therefore overwhelmingly support the inference that Wright was, during the 8 August Sale, wilfully involved in a conspiracy to distribute heroin.[20]

The evidence offered by the Government provided a sufficient basis on which the jury could rationally have concluded, beyond a reasonable doubt, that Wright had knowingly entered into an agreement to possess and distribute heroin, with the intention of carrying out this illicit agreement. Such evidence therefore was sufficient to sustain Wright's conspiracy conviction under section 846. *Salmon,* 944 F.2d at 1113. Accordingly, Wright's motion for acquittal is denied as to Count I.

 In support of acquittal, Wright contends his confession during the 8 August Interview was uncorroborated and therefore insufficient to sustain a conviction. *See* Wright Response at 5; Wright Brief at 3. It

---

**20.** Evidence of Wright's conduct during the January Sale also demonstrated his involvement in an ongoing conspiracy to distribute heroin, of which the 8 August Sale was a part. Agent Monroe testified that, during the January Sale, he was met by an "unidentified black male" with whom he exchanged money for heroin. Agent Monroe testified that the unidentified male then spoke of forming "some type of heroin network between New York and Atlantic City." Tr. at 123.

Agent Monroe testified that "shortly thereafter," he and the unidentified male were joined by Wright." Wright reiterated the unidentified male's desire to form a "heroin network between Atlantic City and New York." *Id.* at 124. Wright also offered Agent Monroe a good price on future transactions. *Id.* Agent Monroe testified that Wright and the unidentified male subsequently left together. *Id.* at 158.

Agent Monroe's testimony clearly indicates the existence of an illegal drug distribution conspiracy between at least Wright and the unidentified male during the January Sale. Because Wright reiterated his plan to set up a heroin network between Atlantic City and New York during the 8 August Sale, the jury could reasonably have inferred that the 8 August Sale "was a step in achieving the conspiracy's common goal of distributing [heroin] for profit." *Theodoropoulos,* 866 F.2d at 593; *see Padilla,* 982 F.2d at 114 (whether series of transactions will constitute single conspiracy depends on the extent to which "the conspirators had a common goal," "the nature of the scheme was such that the agreement contemplated bringing about a continuous result that would not continue without the continuous cooperation of the conspirators," and "to what extent did the participants overlap in various dealings").

is recognized that "in order to convict a defendant of a crime based upon an extrajudicial confession or admission, the defendant's statement must be corroborated by some evidence of the *corpus delicti.*"[21] *Government of the Virgin Islands v. Harris,* 938 F.2d 401, 409 (3d Cir.1991); *see Opper v. United States,* 348 U.S. 84, 90–91, 75 S.Ct. 158, 162–63, 99 L.Ed. 101 (1954).

However, "the corroboration need not be sufficient, independent of the statements of the accused, to establish the *corpus delicti,* and what the [G]overnment must do, in order to furnish sufficient corroboration, is to introduce substantial evidence which would tend to establish the trustworthiness of the statement." *United States v. Wilson,* 436 F.2d 122, 124 (3d Cir.), *cert. denied,* 402 U.S. 912, 91 S.Ct. 1393, 28 L.Ed.2d 654 (1971); *see Opper,* 348 U.S. at 93, 75 S.Ct. at 164 ("It is sufficient if the corroboration supports the essential facts admitted sufficiently to justify a jury inference of their truth."); *Harris,* 938 F.2d at 410 (quoting *Wilson,* 436 F.2d at 124); *United States v. Felder,* 572 F.Supp. 17, 21 (E.D.Pa) ("In order to corroborate a confession or admission, it is unnecessary for the prosecutor to introduce substantial independent evidence of each element of the offense charged."), *aff'd without op.,* 722 F.2d 735 (3d Cir.1983).

■ Evidence sufficient to corroborate a substantial part of the confession will establish the trustworthiness of the entire confession. *See Wilson,* 436 F.2d at 124 ("Since two parts of [the defendant's] confession were corroborated by other evidence, this established the trustworthiness of the entire admission and authorized the prosecutor to prove the element of interstate transportation solely by [the defendant's] admission...."); *see also Harris,* 938 F.2d at 410 (quoting same language from *Wilson*). Moreover, "[a] confession may be corroborated in a number of ways. A degree of corroboration may be found in the detailed nature of the confession itself, or in the recital of

facts that would be unknown to anyone other than the criminal." *Felder,* 572 F.Supp. at 22; *see Harris,* 938 F.2d at 410 (quoting *Felder,* 572 F.Supp. at 22, with approval).

In the instant case, as demonstrated above, each of the offense elements supported by Wright's statements during the 8 August Interview was supported as well by independent evidence, such as the testimony of Agent Monroe, the testimony of Agent Zyckowski, and the tape recorded conversations; most of the individual statements made by Wright during that confession were directly corroborated by this independent evidence. Indeed, such additional evidence would by itself have been sufficient to establish the offense elements beyond a reasonable doubt. This evidence, along with the detailed nature of Wright's confession, sufficiently establish the trustworthiness of the confession to justify the jury's use of the confession in reaching its verdict. *See Harris,* 938 F.2d at 418; *Felder,* 572 F.Supp. at 22. Wright's confession, along with the independent testimonial and tape recorded evidence, provided overwhelming support for the jury's conviction of Wright on both Count I and Count II.

### B. Motion for New Trial

In the alternative, Wright has moved for a new trial pursuant to Fed.R.Crim.P. 33. Rule 33 provides: "The court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice." Fed.R.Crim.P. 33.

■ "Whether to grant a Rule 33 motion lies within the sound discretion of the district court." *United States v. Keyser,* No. 91–682–01, 1994 WL 12117 at *4 (E.D.Pa. 14 Jan. 1994); *see United States v. Iannelli,* 528 F.2d 1290, 1292 (3d Cir.1976); *United States v. Gonzalez,* No. 92–517–01, 1993 WL 364711 at *9 (E.D.Pa. 13 Sept. 1993). The motion can be granted on either of two grounds: "First, the [c]ourt may grant a new trial if,

---

21. The Third Circuit has noted that "[t]he *corpus delicti* doctrine generally governs the admissibility of evidence, not the sufficiency of the evidence to convict." *Harris,* 938 F.2d at 409 n. 6. "However," the Circuit stated, "corroboration is a factor to be considered in weighing the suffi-

ciency of the evidence." *Id.* Therefore, the inquiry on a motion for judgment of acquittal is "whether a rational trier of fact could have found the defendant guilty based on the confession and the corroborating evidence." *Id.*

after weighing the evidence, it determines there has been a substantial miscarriage of justice." *Government of the Virgin Islands v. Commissiong*, 706 F.Supp. 1172, 1184 (D.V.I.1989); *see Keyser*, 1994 WL 12117 at *4; *United States v. Fleming*, 818 F.Supp. 845, 846 (E.D.Pa.), *aff'd without op.*, 9 F.3d 1542 (3d Cir.1993); *United States v. Yun*, 718 F.Supp. 366, 368 (D.N.J.1989). "Second, the [c]ourt must grant a new trial if error had a substantial impact on the verdict." *Commissiong*, 706 F.Supp. at 1184; *see Keyser*, 1994 WL at 4; *Villard*, 700 F.Supp. at 815.

■■■ "A motion for a new trial is not favored and is viewed with great caution." *United States v. Miller*, 987 F.2d 1462, 1466 (10th Cir.1993); *see United States v. Goodwin*, 770 F.2d 631, 639 (7th Cir.1985), *cert. denied*, 474 U.S. 1084, 106 S.Ct. 858, 88 L.Ed.2d 897 (1986); *United States v. Clemons*, 658 F.Supp. 1116, 1119 (W.D.Pa.1987) ("[T]he power to grant a new trial should be exercised sparingly."), *aff'd*, 843 F.2d 741 (3d Cir.), *cert. denied*, 488 U.S. 835, 109 S.Ct. 97, 102 L.Ed.2d 73 (1988). Moreover, in the absence of plain error, "[a] defendant's failure to object to an alleged error [during trial] generally precludes him from asserting the claimed error in a motion for a new trial." *United States v. McBride*, 862 F.2d 1316, 1319 (8th Cir.1988); *see United States v. Flake*, 746 F.2d 535, 543 (9th Cir.1984) ("The failure to object to an instruction before the trial court is a bar to any challenge before this court in the absence of plain error."), *cert. denied*, 469 U.S. 1225, 84 L.Ed.2d 360 (1985); *United States v. Bevans*, 728 F.Supp. 340, 346 (E.D.Pa.) (incompetency of witness could not be raised for first time in motion for new trial), *aff'd*, 914 F.2d 244 (3d Cir.1990); *United States v. Lowell*, 490 F.Supp. 897, 906 (D.N.J.1980) ("Alleged instances of prosecutorial misconduct must be the subject of an objection at trial in order to

be raised in a motion for a new trial."), *aff'd*, 649 F.2d 950 (3d Cir.1981).

In moving for a new trial, Wright has engaged in a virtual fishing expedition. In an apparent effort to turn attention away from the overwhelming evidence of his guilt adduced at trial, Wright requests a new trial based on errors he attributes to every party to this litigation other than himself, namely the Government, the court and even his own trial counsel. He has alleged numerous instances of prosecutorial misconduct, judicial error and ineffective assistance of counsel, many of which were not raised at trial, and most of which are patently frivolous.[22] Only the least frivolous of these will be addressed.

■■■ Wright does not appear to request a new trial based on the insufficiency of the evidence. However, to the extent he does, his request fails. "Rule 33 motions based on the weight of the evidence are not favored, and should be granted only in exceptional circumstances." *Gonzalez*, 1993 WL 364711 at *9; *see Government of the Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir.1987). "In the Third Circuit, a court is not permitted to sit as a thirteenth juror and set aside the verdict simply because it feels some other result would be more reasonable." *Gonzalez*, 1993 WL 364711 at 9; *see Derricks*, 810 F.2d at 55. Rather, "[t]he evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Gonzalez*, 1993 WL 364711 at *9.

■■■ As discussed, the evidence against Wright overwhelmingly supported his conviction on both Count I and Count II. Based on the weight of the evidence, Wright's conviction did not present a miscarriage of justice; a new trial is not warranted by the weight of the evidence. *See Derricks*, 810 F.2d at 55.

---

22. For example, Wright argues it was error for the court to fail to instruct the jury that proof of an overt act is required to sustain a conviction under section 846. Wright Brief at 13. As stated, proof of an overt act is not necessary to a conviction under section 846. *See Johnstone*, 856 F.2d at 542.

Wright also asserts it was error for the court to instruct the jury that Wright could be convicted

under section 846 if it was determined that he conspired with at least one other person, regardless of whether that person was named in the Indictment. Wright Response at 8. As stated, however, Wright could be convicted of conspiring only with persons not named in the Indictment; the instruction to that effect was proper. *See Allen*, 613 F.2d at 1253.

■ In support of his motion for a new trial, Wright first alleges several instances of prosecutorial misconduct. Specifically, Wright points to several statements made by the Government during its closing argument. "Improprieties in a prosecutor's remarks warrant a new trial only if they are so gross that there is a probability of prejudice to the defendant[.] and such prejudice was not neutralized by the court." *United States v. Gaines*, 726 F.Supp. 1457, 1469 (E.D.Pa. 1989), *aff'd*, 902 F.2d 1562 (3d Cir.), *cert. denied*, 498 U.S. 844, 111 S.Ct. 128, 112 L.Ed.2d 96 (1990); *see United States v. Gonzalez*, 833 F.2d 1464, 1466 (11th Cir.1987); *Flake*, 746 F.2d at 542. "Moreover, any harm from prosecutorial misconduct must affect a substantial right and the prejudice must be balanced against the evidence of guilt." *Gaines*, 726 F.Supp. at 1469; *see Gonzalez*, 833 F.2d at 1467 ("Given the overwhelming evidence against [the defendant], her substantial rights were not prejudiced by the ... remark of the prosecutor."). As the Supreme Court has stated: "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)).

■ With respect to the Government's closing argument in the instant case, Wright first contends it was misconduct to argue to the jury that if it found that Wright was a "facilitator," of the crime charged, then it must also find he was a conspirator in the crime charged.[23] Wright Response at 8. No objection was made to the AUSA's comment in this regard at trial; the issue, therefore, may not be raised for the first time in the instant motion in the absence of plain error. *See Lowell*, 490 F.Supp. at 906.

■ It was not plain error to permit the comments of the AUSA regarding the definition of the term "facilitator." Other courts have, in fact, used the term "facilitator" in describing the requirements of a conspiracy conviction. For example, the Tenth Circuit has stated:

To reasonably infer a[ ] [conspiratorial] agreement the defendant's conduct must be interdependent with the conduct of other conspirators. Interdependence requires more than casual transactions or mere associations; the defendant's activities must *facilitate* the endeavors of other conspirators or the venture as a whole.

*United States v. Arutunoff*, 1 F.3d 1112, 1116 (10th Cir.) (emphasis added), *cert. denied*, — U.S. ——, 114 S.Ct. 616, 126 L.Ed.2d 580 (1993); *see United States v. LaValley*, 999 F.2d 663, 665–66 (2d Cir.1993) ("Steerer or a facilitator" could be guilty of conspiracy under section 846).

■ In the instant case, moreover, the evidence was sufficient to convict Wright not as a mere facilitator, but as a principal planner of the conspiracy. It was in fact the focus of the Government's case that this was Wright's deal, and not a deal in which Wright was a peripheral or minor· participant. *See* Tr. at 205 (AUSA stated in closing: "Of course, the Government argues more than that [Wright was a facilitator]. That this was his deal."). In light of the overwhelming support for such a theory in the record, the AUSA's comments, even if an incorrect statement of the law, were not sufficiently prejudicial to Wright to warrant a new trial.[24] *See Gaines*, 726 F.Supp. at 1469.

---

**23.** During his closing argument, Wright's trial counsel stated that Wright "may have been a facilitator, but that's a little different than being the actual trafficker." Tr. at 196. Later, during his closing, the Assistant United States Attorney ("AUSA") stated:

Now, the defendant's attorney said that with regard to the [8 August Sale], the most we have the defendant as a facilitator. That's the word he used. Well, if he was a facilitator, he was a conspirator, because they're the same. Some-

one who facilitates the crime is a co-conspirator in a crime because he's helped the crime, he facilitated it. If that's what you find the defendant did, then you should find the defendant guilty. Of course, the Government argues more than that. That this was his deal.

Tr. at 205.

**24.** The AUSA stated to the jury in his closing:

In a little while, the Judge is going to instruct you as to what the law was in this area.

Wright also contends it was misconduct for the AUSA to make references in his closing to portions of Wright's confession at the 8 August Interview. Wright Brief at 10; Wright Response at 10. Specifically, Wright argues it was improper for the AUSA to make reference to Wright's confession as to the June 1991 Solicitation and the 23 July Transfer. *Id.* Wright's confession was, however, in evidence, and it was therefore fair for the AUSA to comment on and recount portions of the confession to the jury in its closing. Moreover, as stated, the confession was sufficiently corroborated to be considered by the jury in evaluating Wright's case.[25] *See supra* at 44–45.

Wright also argues it was misconduct for the AUSA to comment on the defense's failure to call Rex as a witness.[26] Wright Brief at 10–11. Wright's trial counsel did not object to the AUSA's comment at trial; Wright cannot raise this issue for the first time in the instant motion in the absence of plain error. *See Lowell,* 490 F.Supp. at 906.

"In general, the failure to produce a favorable witness or other evidence when it is peculiarly within a party's power to do so creates an inference that the witness' testimony will be unfavorable." *United States v. Charles,* 738 F.2d 686, 698 (5th Cir.1984); *see United States v. Cook,* 771 F.2d 378, 382–83 (8th Cir.1985); *United States v. Busic,* 587 F.2d 577, 586 (3d Cir.1978), *rev'd on other grounds,* 446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980). It cannot, therefore, be said that the comment on Wright's failure to call Rex was plain error. *See United States v. Lehmann,* 613 F.2d 130, 136 (5th Cir.1980) (The question of whether a witness not called is peculiarly within a party's power to produce "is largely a question of fact, and various courts have regarded all manner of circumstances as bearing upon the matter.").

To the extent the AUSA's comments were improper, they were not sufficiently prejudicial to warrant a new trial. As indicated, prosecutorial misconduct may be neutralized, and a new trial unwarranted, where the court gives the jury a curative instruction. *See Gaines,* 726 F.Supp. at 1469. The AUSA expressly acknowledged: "[A]s the judge has instructed you and I'm sure will instruct you again, the defendant has no duty

---

What the judge tells you is what will govern here, not what I say on the subject.
Tr. at 178.

The jury was subsequently instructed as to the proper elements of a conspiracy conviction under section 846. This instruction, along with the AUSA's comment that the court's instructions controlled, cured any possible prejudice which may have resulted from the AUSA's statements. *See Gaines,* 726 F.Supp. at 1469 (new trial not warranted where prejudice from prosecutor's comments neutralized by court).

**25.** Wright also argues that it was misconduct for the AUSA to refer to the 23 July Transfer in his closing argument because evidence of this event constituted inadmissible 'prior bad act' evidence under Federal Rules of Evidence 403 and 404(b). Wright Response at 11.

Wright's argument in this regard fails for two reasons. First, regardless of the character of the evidence regarding the 23 July Transfer, such evidence was admitted at trial and the AUSA was therefore entitled to comment on this evidence in its closing.

To the extent Wright objects to the initial admission of the evidence of the 23 July Transfer, Wright's trial counsel did not object to the admission of the evidence on this ground at trial; therefore, such an objection cannot, absent plain error, be made in Wright's motion for a new trial. *See Lowell,* 490 F.Supp. at 906. The admission of evidence of the 23 July Transfer was not plain error, in that such evidence was not inadmissible 'prior bad act' evidence, but was instead direct evidence of the conduct charged in the Indictment.

Count I of the Indictment charged Wright with having conspired in violation of section 846 "[b]etween on or about July 23, 1991 and on or about August 8, 1991." Indictment at 1. Evidence of the 23 July Transfer was, therefore, direct evidence of the conduct charged in the Indictment and was not excludable as 'other act' evidence under Rule 404(b). *See United States v. Blyden,* 964 F.2d 1375, 1378 (3d Cir.1992) ("Rule 404(b) presupposes the existence of *other* crimes. When evidence of another crime is necessary to establish an element of the offense being tried, there is no 'other crime.'" (emphasis in original)).

**26.** During his closing, the AUSA argued:

[A]s the judge has instructed you and I'm sure will instruct you again, the defendant has no duty to come forward in this case with any evidence. He has no burden of proof in this case. But if he truly believed that George Rex could help his case, he could have subpoenaed him.
Tr. at 183.

to come forward in this case with any evidence." Tr. at 183. The jury was later instructed by the court:

> [T]he burden of proof is on the Government and it never shifts. It remains on the Government throughout the entire trial. A defendant has no burden with respect to proof. He has no burden with regard to proving his innocence....
>
> The law never places upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

*Id.* at 218, 223. These instructions were sufficient to cure any prejudice to Wright which may have resulted from the comment on the absence of Rex. *See United States v. Anchondo–Sandoval,* 910 F.2d 1234, 1238 (5th Cir.1990) (stating with regard to Government's comment on missing witness: "Whatever prejudice may have resulted from the improper comments should have been neutralized by the court's instruction. The trial court gave the proper cautionary instructions following the prosecutor's remarks, and the general instructions to the jury at the close of argument underscored the [G]overnment's burden").[27]

■ As indicated, the evidence against Wright in this case was overwhelming. *See supra* at 30–42. The comment on the absence of Rex did little to alter the balance of evidence against Wright. "In the face of such compelling evidence, [it] cannot [be] conclude[d] that the remarks by the prosecutor urging the jury to draw an additional inculpatory inference from the absence of a single witness casts doubt upon the jury's verdict." *Cook,* 771 F.2d at 383. In the

absence of such doubt, a new trial is unwarranted.[28] *See Commissiong,* 706 F.Supp. at 1184.

■ Wright also argues the Government committed misconduct in failing to disclose to Wright potentially exculpatory and impeachment-related evidence in accordance with the requirements of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and the Jencks Act, 18 U.S.C. § 3500. "Nondisclosure of [exculpatory or impeachment] information will rise to the level of a constitutional violation, and require a new trial, only where that information is found to be material for the purposes of the due process clause." *Cantone v. Superintendent, New York Correctional Facility at Green Haven,* 759 F.2d 207, 213 (2d Cir.), *cert. denied,* 474 U.S. 835, 106 S.Ct. 109, 88 L.Ed.2d 89 (1985); *see United States v. Frankhauser,* 878 F.2d 1571, 1574–75 (1st Cir.1989); *United States v. Alberici,* 618 F.Supp. 660, 669 (E.D.Pa.1985).

As the Supreme Court has stated:

> [E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine the confidence in the outcome.

*United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985); *see United States v. Nixon,* 881 F.2d 1305, 1308 (5th Cir.1989); *United States v. Pandozzi,* 878 F.2d 1526, 1528 (1st Cir.1989); *Alberici,* 618 F.Supp. at 669; *see also United States v. Leisure,* 844 F.2d 1347, 1361 (8th Cir.) (alleged violations of Jencks Act were

---

**27.** Wright's counsel also commented on the Government's failure to call Rex as a witness, stating:

> [Rex] is critical in this case. You have not had the opportunity to assess him from the witness stand at all. You have not had the opportunity to say this person is in fact, the FBI's chief witness against ... Wright. What was his demeanor? He's not here.

Tr. at 191.

In light of these comments, which were far more extensive than those of the AUSA on the issue, the jury was at least as likely to interpret Rex's absence against the Government as it was to interpret such absence in a manner unfavora-

ble to Wright. Because it was unlikely that the jury drew an inference unfavorable to Wright from the AUSA's comments, it is unlikely that prejudice occurred, and a new trial is therefore unwarranted. *See Gaines,* 726 F.Supp. at 1469.

**28.** Wright also contends, without legal support, that the AUSA's comment on Rex's failure to testify violated Wright's Fifth Amendment privilege against self-incrimination. Wright Brief at 11. This argument is meritless, in that the Government made no comment as to Wright's failure to testify, and thus did nothing to chill Wright's privilege against self-incrimination under the Fifth Amendment.

not "sufficiently exculpatory to warrant a new trial"), *cert. denied*, 488 U.S. 960, 109 S.Ct. 403, 102 L.Ed.2d 392 (1988); *United States v. Cattle King Packing Co., Inc.*, 793 F.2d 232, 245 (10th Cir.) (Where undisclosed evidence had "only marginal impeachment value, . . . it was not error for the trial court to refuse to grant a new trial based upon any alleged failure to turn the records over to the defense."), *cert. denied*, 479 U.S. 985, 107 S.Ct. 573, 93 L.Ed.2d 577 (1986).

In determining the materiality of undisclosed evidence, the court must consider the circumstances and other evidence offered at trial. "Courts have found, for example, that impeachment evidence improperly withheld was not material where the testimony of the witness who might have been impeached was strongly corroborated by additional evidence supporting a guilty verdict." *United States v. Weintraub*, 871 F.2d 1257, 1262 (5th Cir. 1989); *see United States v. Risken*, 788 F.2d 1361, 1375 (8th Cir.), *cert. denied*, 479 U.S. 923, 107 S.Ct. 329, 93 L.Ed.2d 302 (1986); *see also United States v. Page*, 828 F.2d 1476, 1479–80 (10th Cir.) (exculpatory evidence not material where it "would not have mitigated the impact of the tape-recorded, self-incriminating remarks" of the defendant), *cert. denied*, 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987).

Impeachment evidence may not be material where the witness who might have been impeached was extensively and vigorously cross-examined by the defense counsel. *See Pandozzi*, 878 F.2d at 1530; *United States v. Steel*, 759 F.2d 706, 714 (9th Cir.1985); *Alberici*, 618 F.Supp. at 676. Moreover, "[A] new trial is not warranted by evidence which, with reasonable diligence, could have been discovered and produced at trial." *Page*, 828 F.2d at 1479; *see Pandozzi*, 878 F.2d at 1529; *Jarrell v. Balkcom*, 735 F.2d 1242, 1258 (11th Cir.1984), *cert. denied*,

473 U.S. 921, 105 S.Ct. 3547, 87 L.Ed.2d 670 (1985); *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir.1982), *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983).

Wright contends the Government violated the requirements of *Brady* by failing to disclose the minutes of Mahadik's "superseding indictment." Wright Brief at 12. Wright's argument in this regard fails on factual grounds. As stated, Mahadik pled guilty to a Superseding Information. There was no superseding indictment, and accordingly no minutes existed that the Government should have disclosed to Wright under *Brady* or the Jencks Act.[29]

Wright further contends the Government violated the requirements of *Brady* by failing to release the body wire tape of the January Sale. Wright Brief at 12. However, Agent Monroe testified that the body wire tape from the January Sale "didn't come out," and was "inaudible." Tr. at 160. At the Post–Trial Motion Hearing, the Government certified that no portion of the tape contained Wright's voice. 10 Feb. Tr. at 2. In light of these facts, the status of the tape of the January Sale under *Brady* is unclear at best.

Moreover, to the extent the tape of the January Sale was disclosable, the Government's failure to disclose such evidence was not sufficiently prejudicial to warrant a new trial. Evidence of the January Sale was at most peripheral to the charges in the Indictment; as indicated, the Indictment focused primarily on the 8 August Sale. In light of the overwhelming quantum of evidence more directly related to those charges, any failure by the Government to disclose evidence related only to the January Sale would not have so prejudiced Wright as to warrant a new trial. *See Cattle King Packing Co., Inc.*,

---

29. To the extent Wright argues the Government should have disclosed the fact and nature of Mahadik's plea, such information was a matter of public record. Any failure by the Government to disclose such readily available information would not warrant a new trial. *See Page*, 828 F.2d at 1479. Moreover, it does not appear that such information would even have been discoverable under *Brady* or the Jencks Act. It does not, for example, appear that the fact of Mahadik's plea would have been exculpatory, and therefore disclosable under *Brady*, in that Mahadik pled guilty to knowledge and concealment of a violation of section 841, a crime of which Wright was charged. *See* Superseding Information; Indictment, Count II. Moreover, Mahadik did not testify at Wright's trial; accordingly, Mahadik's plea would not have been disclosable under the Jencks Act.

793 F.2d at 245 (nondisclosure of evidence with only marginal value to defendant did not warrant new trial).

 Wright further argues it was a Jencks Act violation for the Government to have allowed Agent Corrigan to destroy interview notes made by him during the 8 August Interview.[30] Wright apparently argues that these notes were necessary to the effective cross-examination of Agent Corrigan. Wright's trial counsel did not seek to have Agent Corrigan's testimony stricken, or otherwise object to Agent Corrigan's testimony, on this ground at trial.[31] Therefore, Wright may only raise this issue in his instant motion if he establishes plain error. *See Lowell*, 490 F.Supp. at 906.

Wright has not established the presence of plain error in this regard. As indicated, Agent Corrigan testified only that he "may have" taken notes of the 8 August Interview, and that, assuming the notes existed, he "probably destroyed them." Tr. at 67. In the absence of clearer indication that interview notes from the 8 August Interview ever existed, it is not plainly apparent that Agent Corrigan's testimony violated the Jencks Act. Accordingly, the admission of the testimony was not plain error, and does not warrant a new trial.

 Even if the interview notes did exist, and the Government did violate the Jencks Act by destroying them, such violation was not so prejudicial to Wright as to warrant a new trial. The Third Circuit addressed a similar issue in *United States v. Niederberger*, 580 F.2d 63 (3d Cir.), *cert. denied*, 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1978). There, an investigator for the Internal Revenue Service ("IRS") who had interviewed the defendant testified as to certain admissions made by the defendant. During cross-examination, the IRS agent revealed his rough notes of the interview had been destroyed pursuant to IRS administrative guidelines. *See* 580 F.2d at 70. "Maintaining that these rough notes were materials which should

have been supplied to him under the Jencks Act, ... the defendant thereupon moved for a mistrial by reason of the Government's failure to preserve and produce the rough notes." *Id.*

The district court denied the motion for mistrial, and the defendant appealed. Reviewing the defendant's Jencks Act claim, the Circuit stated: "[T]he rough interview notes of [Government] agents should be kept and produced so that the trial court can determine whether the notes should be made available to the [defendant] under *Brady* ... or the Jencks Act." 580 F.2d at 71 (quoting *United States v. Vella*, 562 F.2d 275, 276 (3d Cir.1977) (defendant claimed district court erred in refusing to exclude, under Jencks Act, testimony of two FBI agents who had destroyed rough notes of interview with defendant)); *see United States v. Ammar*, 714 F.2d 238, 259 (3d Cir.) (establishing policy that Government must retain and make available rough investigatory notes of agents), *cert. denied*, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983).

Notwithstanding the state of the law in this regard, the Circuit held that the strong evidence in support of conviction, and the lack of bad faith on the part of the Government, rendered any error harmless:

> However, despite the requirements of *Vella*, on the record before us it is our view that even without the IRS investigator's testimony the Government's evidence established a sufficient basis for the jury to reach its verdict. This conclusion, coupled with the absence of any suggestion that the destruction of the notes under IRS administrative procedure was performed in bad faith, requires a finding that if there were error below it was harmless.

*Niederberger*, 580 F.2d at 71; *see Vella*, 562 F.2d at 276 ("For the purposes of the present appeal, we have determined that in light of the other evidence in the record, as well as the apparent good faith administrative deci-

---

**30.** As indicated, the Government certified at the Post–Trial Motion Hearing that the 8 August 302 Summaries were turned over to Wright. 10 Feb. Tr. at 2.

**31.** It is apparent that Wright's attorney was aware at trial of the issue of the interview notes. As indicated, Wright's attorney brought up the issue during his cross-examination of Agent Corrigan. *See* Tr. at 67.

sion which led to the destruction of the notes, the error must be considered harmless."); *see also Ammar,* 714 F.2d at 260 (where handwritten drafts of typed reports were destroyed, destruction was harmless error where not done in bad faith, and handwritten drafts were substantially identical to typed reports).

As in *Niederberger* and in *Vella,* there was overwhelming evidence, outside of the testimony of Agent Corrigan, in support of Wright's conviction. Indeed, as noted, the testimony of Agent Monroe and the tape recorded conversations themselves "established a sufficient basis for the jury to reach its verdict." *Niederberger,* 580 F.2d at 71; *see supra* at 1058–63. Moreover, as in *Niederberger* and in *Vella,* there is no indication that the Agent Corrigan or the FBI, or any other agent of the Government, acted in bad faith in destroying notes of the 8 August Interview. Therefore, even assuming that the notes once did exist, and that they were destroyed by Agent Corrigan in violation of the Jencks Act, this violation was not sufficiently prejudicial to warrant a new trial.[32] *See Niederberger,* 580 F.2d at 71; *Vella,* 562 F.2d at 276; *see also Weintraub,* 871 F.2d at 1262 (failure to disclose Jencks Act evidence not material where testimony of witness who would have been impeached, "was strongly corroborated by additional evidence supporting a guilty verdict").

■ Finally, Wright requests a new trial based on his assertion of ineffective assistance of counsel. Wright Brief at 15. The Sixth Amendment provides in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. Const. Amend. VI. A defendant has a Sixth Amendment right not just to counsel, but to "reasonably effective counsel." *United States v. Day,* 969 F.2d 39, 42 (3d Cir.1992) (quoting *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984)); *Wells v. Petsock,* 941 F.2d 253, 259 (3d Cir.1991), *cert. denied sub nom., Wells v.*

*Vaughn,* — U.S. —, 112 S.Ct. 3038, 120 L.Ed.2d 906 (1992).

■ The Supreme Court has set forth the test for ineffective assistance of counsel claims as follows:

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064; *see also Wells,* 941 F.2d at 259. A litigant claiming ineffective assistance of counsel "must prove both incompetence and prejudice." *Kimmelman v. Morrison,* 477 U.S. 365, 381, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305 (1986) (citing *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2065); *accord Day,* 969 F.2d at 42.

With respect to the first prong of the *Strickland* test, the Supreme Court explained that the defendant "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064; *Hull v. Freeman,* 932 F.2d 159, 167 (3d Cir.1991). The Supreme Court has further stated:

"A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.... The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."

*Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066; *see also Zettlemoyer v. Fulcomer,* 923 F.2d

---

**32.** Wright also contends the Government violated the requirements of *Brady* and the Jencks Act by failing to deliver all of the investigative tape recordings in its possession. However, at the Post–Trial Motion Hearing, the Government certified that it did in fact deliver to Wright all sixteen of the investigative tape recordings made in relation to Wright's case. 10 Feb. Tr. at 1.

284, 296 (3d Cir.1991) (defense counsel cannot be deemed ineffective just because counsel is not successful), *cert. denied,* — U.S. ——, 112 S.Ct. 280, 116 L.Ed.2d 232, *reh'g denied,* — U.S. ——, 112 S.Ct. 624, 116 L.Ed.2d 646 (1991).

■ With respect to the second .prong of the inquiry, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test." *Strickland,* 466 U.S. at 693, 104 S.Ct. at 2067. Rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*

The Circuit has elaborated: *"Strickland v. Washington* does not require certainty or even a preponderance of the evidence that the outcome would have been different with effective assistance of counsel; it requires only a reasonable probability that that is the case." *Day,* 969 F.2d at 45 n. 8; *see also United States v. Baynes,* 687 F.2d 659, 670 (3d Cir.1982) (cited with approval in *McNeil v. Cuyler,* 782 F.2d 443, 447 (3d Cir.), *cert. denied,* 479 U.S. 1010, 107 S.Ct. 654, 93 L.Ed.2d 709 (1986)). Nevertheless, the petitioner must demonstrate that, but for unprofessional errors by counsel, the result of the proceeding would have been different. *Kimmelman,* 477 U.S. at 381, 106 S.Ct. at 2586;. *Hull,* 932 F.2d at 167.

Moreover, as the Supreme Court stated in *Strickland:*

> [T]here is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . *If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.*

466 U.S. at 697, 104 S.Ct. at 2069 (emphasis added).

■ "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065; *Moore v. Deputy Commissioners,* 946 F.2d 236, 246 (3d Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 1509, 117 L.Ed.2d 647 (1991). In assessing an attorney's performance, courts must be "highly deferential" and "must indulge a strong presumption that counsel's challenged conduct falls within the wide range of reasonable professional assistance." *Id.; see also Reese v. Fulcomer,* 946 F.2d 247, 257 (3d Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1679, 118 L.Ed.2d 396 (1992); *Moore,* 946 F.2d at 246; *Hull,* 932 F.2d at 167; *United States v. Gray,* 878 F.2d 702, 710 (3d Cir.1989).

■ In making a determination of ineffective assistance, a court must consider the "totality of evidence." *Hull,* 932 F.2d at 167–68 (citing *Strickland,* 466 U.S. at 695–96, 104 S.Ct. at 2069); *see also Reese,* 946 F.2d at 256 (court must consider "all facts of the case" in reviewing claim for ineffective assistance).

■ In the instant case, Wright has failed to fulfill either of the requirements of a claim of ineffective assistance of counsel. Wright argues that his counsel's failure to register objections at various points during trial, and to more extensively cross-examine Government witnesses, amounts to ineffective assistance and warrants a new· trial.[33]

33. Wright also contends his trial counsel was ineffective for "labeling [Wright] a facilitator before the jury." Wright Response at 15. Contrary to Wright's contentions, Wright's counsel did not label Wright a facilitator. Rather, he stated Wright "may have been a facilitator, but that's a little different from being an actual trafficker." Tr. at 196. In its proper context, this comment did not concede that Wright was a facilitator, but instead argued that even if the jury found Wright to be a facilitator, it need not find he was a drug trafficker. The statement does not, therefore indicate that Wright's counsel abandoned him during his closing, as argued by Wright. In fact, Wright's trial counsel argued

Wright Brief at 17; Wright Response at 5 n. 4, 10 n. 11. Quite to the contrary, the record shows Wright's trial counsel was diligent and vigilant at all times during the trial. He extensively and effectively cross-examined all of the Government's witnesses, and was not deficiently lax in registering objections to evidence and testimony offered by the Government. As Wright was told by the court at the Sentencing Hearing, "[t]he fact of the matter is your attorney worked wonders with what he had to work with.... [H]e made the proverbial silk purse out of a sow's ear." Tr. at 30. The record shows that the efforts of Wright's trial counsel were not in fact deficient, but were simply overwhelmed by the weight of the evidence against Wright and in favor of conviction.[34]

 Wright further complains of his trial counsel's failure to meet with him and to accept his collect phone calls before trial. Wright Traverse at 5. When Wright brought up this issue at the Sentencing Hearing, his trial counsel stated: "[C]ontrary to [Wright's] assertions, each time he has been in court before trial, we spoke." Sentencing Tr. at 40. Moreover, Wright has not alleged how any failure of his trial counsel to meet with him prejudiced him during trial. "[B]revity of time spent in consultation, without more, does not establish that counsel was ineffective." *Easter v. Estelle,* 609 F.2d 756, 759 (5th Cir.1980); *see United States v. Soto Hernandez,* 849 F.2d 1325, 1328 (10th Cir. 1988) ("[A]ny lack of communication was not such that it rendered [counsel's] assistance *per se* ineffective."); *United States v. Goudy,* 792 F.2d 664, 673 (7th Cir.1986) (Defendant's

"assertion that his attorney failed to visit him during the months immediately preceding trial does not establish that his counsel was not adequately prepared for trial."); *Healy v. New York,* 453 F.Supp. 14, 16 (S.D.N.Y.1978) ("[T]he failure to consult with a defendant is not a *per se* violation of the defendant's Sixth Amendment rights...."); *cf. United States ex rel. Washington v. Maroney,* 428 F.2d 10, 14 (3d Cir.1970) (lack of consultation may constitute ineffective assistance where counsel appointed on day of trial, and could not have had adequate opportunity to prepare for trial). In the instant case, the record reveals that Wright was fully informed of the essentials of his defense, and that Wright's counsel was properly prepared for each phase of trial. Under such circumstances, any failure on the part of Wright's trial counsel to consult more frequently with Wright did not render his assistance ineffective.

 In any event, the evidence against Wright was so strong that any deficiency on the part of Wright's counsel was clearly not prejudicial. The Government established every element of the charges against Wright independently by three forms of evidence: testimonial evidence, tape recorded evidence and the statements of Wright himself. Moreover, each of these strains of evidence was consistent with, and served to corroborate, the other strains. In light of the weight of evidence against Wright, it is not reasonably probable that, but for the conduct of Wright's counsel as alleged by Wright, the verdict would have been different.[35] *See Strickland,* 466 U.S. at

---

vigorously and effectively for acquittal during his closing and throughout trial.

To the extent this comment was deficient, it was not prejudicial in light of the strong and extensive evidence offered by the Government against Wright. Stated differently, it is not reasonably probable that, absent this comment by Wright's trial counsel, the verdict would have been different. *See Strickland,* 466 U.S. at 693, 104 S.Ct. at 2067.

**34.** Wright did not, in fact, raise the issue of ineffective assistance or complain about the performance of his trial counsel once before his conviction, in spite of the fact that there were many breaks during the course of trial.

**35.** Wright also seeks a new trial on the grounds of comments made by his trial counsel, at the Sentencing Hearing, regarding the strength of the evidence against Wright. Wright Response at 14. All of these comments were made by Wright's trial counsel in response to Wright's complaints regarding counsel's effectiveness, and some were made after the trial counsel had been relieved from further representation of Wright. Sentencing Tr. at 36–38. Because these comments were made after the rendering of the verdict, and outside the presence of the jury, they could not have affected the outcome of trial in a manner which would warrant a new trial. *See Strickland,* 466 U.S. at 693, 104 S.Ct. at 2067. To the extent Wright argues his attorney's comments prejudiced him with regard to sentencing,

693, 104 S.Ct. at 2067. Wright is therefore not entitled to a new trial by reason of ineffective assistance of counsel.

these comments were not considered in sentencing Wright, and therefore do not warrant resentencing.

Wright also argues his trial counsel's assistance was rendered ineffective by conflict of interest. Wright has not, however, suggested that his trial counsel was laboring under a conflict between representing Wright and another client, or between representing Wright and allegiance to a third party who is paying counsel fees. Wright merely points to an alleged conflict as a result of Wright's nonpayment of legal fees and insistence on making collect calls to his counsel. This state of facts does not establish a conflict of interest of the type which would establish ineffective assistance; lawyers are required to provide zealous advocacy regardless of a criminal defendant's failure to pay legal fees.

Finally, Wright argues his attorney improperly "waived his rights under Fed.R.Crim.P. 43(a) to be present during *every* aspect of trial ... by failing to allow the defendant to approach the bench during jury selection." Wright Response at 17 n. 18. There is no indication the court requested Wright to approach the bench during jury selection. This argument is patently unmeritorious and is therefore rejected.

**36.** While Wright was granted a hearing on his post-trial motions, a full evidentiary hearing was not necessary. The decision as to whether to grant an evidentiary hearing on a motion for a new trial is addressed to the sound discretion of the trial court. *See United States v. Begnaud,* 848 F.2d 111, 113 (8th Cir.1988); *United States v. Berry,* 627 F.2d 193, 197 (9th Cir.1980), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 925, 66 L.Ed.2d 843 (1981); *United States v. Cardarella,* 588 F.2d 1204, 1205 (8th Cir.1978). "A district court, when entertaining a motion for a new trial, may rely on knowledge gained while presiding over trial...." *United States v. Tucker,* 836 F.2d 334, 337 (7th Cir.), *cert. denied,* 488 U.S. 855, 109 S.Ct. 143, 102 L.Ed.2d 115 (1988). Even where there are disputed issues of fact, such issues "can ordinarily be decided on the basis of affidavits without an evidentiary hearing." *United States v. Kelly,* 790 F.2d 130, 134 (D.C.Cir.1986); *see United States v. Sensi,* 879 F.2d 888, 900 n. 12 (D.C.Cir.1989); *United States v. Abou–Saada,* 785 F.2d 1, 6 (1st Cir.), *cert. denied,* 477 U.S. 908, 106 S.Ct. 3283, 91 L.Ed.2d 572 (1986); *United States v. Hamilton,* 559 F.2d 1370, 1373 (5th Cir.1977). Moreover, an evidentiary hearing will not be required where the arguments advanced in support of a new trial are baseless or frivolous. *See United States v. Salerno,* 868 F.2d 524, 541 (2d Cir.) (no evidentiary hearing required where "conclusory assertions raised no plausible issue concerning actual conflicts or adverse effects on counsel performance"), *cert. denied,* 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 700

Wright has offered no colorable argument on which a new trial is warranted under Rule 33. Accordingly, Wright's motion for a new trial is denied.[36]

(1989); *Tucker,* 836 F.2d at 337 (no evidentiary hearing required where new evidence offered would not have had effect on outcome of trial); *United States v. Kimberlin,* 805 F.2d 210, 251 (7th Cir.1986) ("[T]here is no support shown for this serious charge [of prosecutorial misconduct] sufficient to warrant a hearing...."), *cert. denied,* 483 U.S. 1023, 107 S.Ct. 3270, 97 L.Ed.2d 768 (1987).

In the instant case, the record, the submissions of the parties and the representations of counsel at the Post–Trial Motion Hearing provided an adequate evidentiary basis upon which to rule on Wright's post-trial motions. Moreover, as indicated, most of Wright's arguments in favor of a new trial were so frivolous and unsupported as to obviate further factual inquiry. Under these facts, a more extensive hearing was not required. Indeed, counsel did not request another hearing.

Also, contrary to Wright's assertions, Wright's presence was not required at the Post–Trial Motion Hearing. Rule 43(a), upon which Wright relies, only requires a defendant to be present at "the arraignment, at the time of the plea, and at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence." Fed.R.Crim.P. 43(a). The Post–Trial Motion Hearing "was not a part of the trial; it was an effort to get another trial." *Council v. Clemmer,* 177 F.2d 22, 24 (D.C.Cir.1949) (presence of accused not required at motion for new trial), *cert. denied,* 338 U.S. 880, 70 S.Ct. 150, 94 L.Ed. 540 (1949); *see United States v. Van Pelt,* No. 92–40042–01–SAC, 1993 WL 360329 at *12 n. 2 (D.Kan. 17 Aug. 1993) (defendant's presence at hearing on motion for new trial and judgment of acquittal not required by Rule 43(a); noting that such post-trial motions "are not listed in this subsection"). Wright's presence was therefore not required by Rule 43(a).

Moreover, Rule 43(c) states that a defendant need not be present "at a conference or argument upon a question of law." Fed.R.Crim.P. 43(c)(3). The issues addressed by Wright's post-trial motions were legal in nature. The only factual issues addressed at the Post–Trial Motion Hearing, those related to the Government's compliance with the requirements of *Brady* and the Jencks Act, were uniquely within the knowledge of the Government. These issues were resolved by the representations of the AUSA on the record, and did not in any way require the testimony of Wright; indeed, as stated, these issues could properly have been resolved by written affidavits of the Government's trial counsel, without the necessity of a hearing. *See Kelly,* 790 F.2d at 134.

Nor was Wright's presence required by the Due Process Clause. Under the Due Process

## C. *Motion for Resentencing*

 As stated, Wright has also moved for resentencing. Pursuant to Fed. R.Crim.P. 35(c): "The court, acting within 7 days after the imposition of a sentence, may correct a sentence that was imposed as a result of arithmetical, technical, or other clear error." Fed.R.Crim.P. 35(c). The only argument Wright has submitted in favor of resentencing is his desire to call character references. Wright Resentencing Brief at 1.

Such character references, however, would be irrelevant to the imposition of Wright's sentence. Wright was sentenced to a mandatory minimum term of 120 months pursuant to 21 U.S.C. § 841(b)(1)(B). Under section 841(b)(1)(B)(i), any person who is convicted of a violation of section 841(a) involving, *inter alia*, "100 grams or more of a mixture or substance containing a detectable amount of heroin," and who "commits such a violation after one or more prior convictions for ... a felony ... relating to narcotic drugs, ... *shall* be sentenced to a term of imprisonment *which may not be less than 10 years....*" 21 U.S.C. § 841(b)(1)(B) (emphasis added).

In the instant case, it was determined Wright had been convicted of a violation of section 841(a)(1), involving more than 100 grams of a mixture of heroin, and had a prior felony conviction for a drug-related offense in the State of Virginia.[37] Sentencing Tr. at 47–48. Under these circumstances, and the relevant law, the sentence of 10 years, or 120 months, was appropriate. *See* 21 U.S.C. § 841(b)(1)(B). Character references would therefore have had no bearing on Wright's sentence. Accordingly, Wright's motion for resentencing is denied.

Clause, "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S.Ct. 2658, 2667, 96 L.Ed.2d 631 (1987). Because, as noted, Wright's presence was not required for the fair resolution of the factual issues addressed at the Post–Trial Motion Hearing, his presence was not required by the Due Process Clause. *See United States v. Sanchez*, 917 F.2d 607, 619 (1st Cir.1990) (where issues addressed at hearing on motion for new trial would not have been affected by input of defendant, due process did not require presence of

## Conclusion

For the reasons set forth above, Wright's post trial motions for judgment of acquittal, new trial and resentencing are denied.

defendant at hearing), *cert. denied*, 499 U.S. 977, 111 S.Ct. 1625, 113 L.Ed.2d 722 (1991); *see also United States v. Alessandrello*, 637 F.2d 131, 138 (3d Cir.1980) ("[T]he scope of Rule 43 was intended to be broader than the constitutional right."), *cert. denied*, 451 U.S. 949, 101 S.Ct. 2031, 68 L.Ed.2d 334 (1981).

**37.** Pursuant to the requirements of 21 U.S.C. § 851(b), Wright was asked before sentencing whether he denied the prior conviction. Wright did not deny the prior conviction. Sentencing Tr. at 47.